Case 1:13-cv-06902-PKC   Document 16-18   Filed 05/16/14   Page 1 of 31
10-11963-cgm   Doc 3663   Filed 08/20/13   Entered 08/20/13 15:56:28   Main Document
Pg 35 of 65

35

1    to investigate claims of nursing home abuse and neglect that

2    occurred to Mr. Ronald Brophy when he was a resident of Holy

3    Family, which she addressed to the clerk of Holy Family and to

4    the clerk of Saint Vincents, as opposed to the director or

5    someone in a position of power --

6            THE COURT:  No officer?

7            MS. SCHULTZ:  Yeah.  Mr. Brophy, she asserts, was

8    therefore a known creditor who was entitled to specific notice.

9            As noted by the Court in Victory Memorial Hospital,

10   which is located 435 B.R. 1 (Bankr. E.D.N.Y. 2010):

11           "The mere requesting of medical files is not

12               sufficient to render a party a known creditor.

13           Records may be requested for a variety of reasons,

14               including to determine if a claim even exists."

15           In the case at hand, Ms. Menkes' letter was not

16   sufficient to create a known creditor.  For these reasons, the

17   liquidating trustee does believe that Mr. Brophy was a known

18   creditor.  Had Ms. Menkes initiated litigation, sent a demand

19   letter to an officer or --

20           THE COURT:  Do you happen to have a copy of that

21   letter?

22           MS. SCHULTZ:  We do, Your Honor.

23           THE COURT:  If you'll put it on the ELMO.

24       (Pause in proceedings.)

25           THE COURT:  Put it as if you're reading it.

Case 1:13-cv-06902-PKC   Document 16-18   Filed 05/16/14   Page 2 of 31
10-11963-cgm   Doc 3663   Filed 08/20/13   Entered 08/20/13 15:56:28   Main Document
Pg 36 of 65

36

1    MS. SCHULTZ:  And Your Honor, this was Exhibit G to

2  the exhibit -- to the reply that was filed by Ms. Menkes on

3  Tuesday.

4    THE COURT:  Okay.  Put it as if you're reading it.

5  There you go.  Somebody has got to put it -- there's little

6  magic buttons that you can push down to make it so you can see

7  the whole thing.

8    (Participants confer.)

9    THE COURT:  You're doing it right, you're doing it

10 right, you're doing it right.  That's enough, right there.

11   MS. SCHULTZ:  So Your Honor, the actual -- or the case

12 -- in this case, the analysis doesn't actually end here.

13 Despite the fact that the debtors were unaware of any claims

14 filed by Mr. Brophy at the time the various bar dates were set,

15 Mr. Brophy did receive notice of each of the applicable bar

16 dates.  We've gone back and we've spoke to Epiq, and we can't

17 tell you specifically why he received notice.  Our best guess

18 is that he was in the AP system because he was owed some sort

19 of a refund or -- you know, we -- you don't clear out your AP

20 when you send that.  You send everyone who was on your AP

21 system for a two-year period.

22   Evidence of the notices that were served on Mr. Brophy

23 can be found on the certificates of service that are found on

24 this Court's docket, at Docket No. 1815, 2373, and 3132.  And

25 Your Honor, we attached these to our motion, as well.

Case 1:13-cv-06902-PKC   Document 16-18   Filed 05/16/14   Page 3 of 31
10-11963-cgm   Doc 3663   Filed 08/20/13   Entered 08/20/13 15:56:28   Main Document
Pg 37 of 65

37

1          THE COURT:  Right.

2          MS. SCHULTZ:  The liquidating trustee recognizes that

3  each of these documents were forwarded to Mr. Brophy at Holy

4  Family.  While we weren't able to confirm precisely what

5  happened with each piece of mail that was received on mister --

6  received on behalf of Mr. Brophy after he left Holy Family, as

7  set forth in Mr. Korf's declaration, it was the policy of SVCMC

8  and each of its nursing homes to forward all mail received for

9  decedent residents to the resident's next of kin.  In the

10  instance case, we have no reasons to believe that policy was

11  not followed.

12          I would note, however, Your Honor, that in the medical

13  records that were attached to the response provided Tuesday

14  evening in support of the assertion that the debtors should

15  have served Mr. Brophy through his next of kin Ms. Garvey, the

16  admission form does contain an address for Ms. Garvey.

17          Furthermore, at the direction of Mr. Korf, and as set

18  forth in his declaration employees of Grant Thornton assisted

19  the debtors' claims and noticing agent with a review of their

20  files to determine if the notices that the debtor sent to Mr.

21  Brophy at Holy Family were returned to sender.  They were not.

22  Thus, the liquidating trustee believes that the debtors did

23  everything they were required to do to provide actual notice to

24  Mr. Brophy of the applicable bar dates, and would contends that

25  we have established that the actual notice of the Chapter 11

1  filing and each of the applicable bar dates was provided to Mr.

2  Brophy.

3      Turning briefly, Your Honor, to the cases relied upon

4  in the response.  The response points primarily to two cases,

5  In Re Federated and ALMA v. AMF Bowling Center, as cases that

6  are analogous to the case at hand.  However, Your Honor, each

7  case is readily distinguishable from the instant case.

8      In Federated, litigation was initiated prior to the

9  Chapter 11 filing.  The debtor entity was actively

10  participating in the litigation and was plainly aware of the

11  potential liability.  There was no question that the claimant

12  was a known creditor.  That, however, is not our case.  In our

13  litigation -- in our case, litigation was commenced, not prior

14  to the petition date, not prior to the bar date, not even prior

15  to confirmation, Your Honor, but nearly a year after Your

16  Honor's confirmation order was entered.

17      In the case of ALMA, the Court found that, where a

18  creditor received no notice of a Chapter 11 filing, it was not

19  precluded from pursuing its administrative claim against the

20  debtors.  Again, that's not our case, Your Honor.  In our case,

21  Mr. Brophy was provided with actual notice of the August 2nd,

22  2011 deadline to file claims arising between April 14th, 2010

23  and May 31st, 2011.  He was provided notice with the May 21st,

24  2012 deadline to file claims arising between June 1st, 2011 and

25  April 30th, 2012, and the July 30th, 2012 deadline to file

1  claims arising between May 1st, 2012 and June 29th, 2012.

2  Additionally, publication notice was made of each of these bar

3  dates in accordance with the court-approved procedures. To the

4  contrary, in the ALMA case, no mention is made of either actual

5  or constructive notice being provided to the claimant. Thus,

6  this case is not analogous to the case at hand.

7       Finally, Your Honor, in the response, Ms. Garvey

8  appears to seek leave to file a late-filed claim, and she

9  explicitly states that she is requesting that the Court lift

10  the automatic stay to allow her to prosecute her claims. Based

11  on the response filed this week, the liquidating trustee does

12  not believe that any of the actions to date on behalf of Ms.

13  Garvey constitute a proper request for either relief. Nor does

14  the liquidating trustee believe Ms. Garvey has met her burden,

15  either with respect to the Pioneer standard or with respect to

16  lifting the stay.

17       To the extent that she wants such relief, Your Honor,

18  there are appropriate mechanisms. She should not make that

19  request in a reply, nor should she drag the liquidating trustee

20  to state court. Rather, she should file the appropriate motion

21  before Your Honor. The liquidating trustee will have time to

22  respond to such a request, and Your Honor will determine how to

23  proceed.

24       THE COURT:  Thank you.

25       Yes, ma'am.

1          MS. MENKES:  Yes, Your Honor.  There are quite a few

2   ad hominem attacks which are mostly gnaws in this matter to

3   deflect the Court's attention from what is the crux of the

4   matter.  My client --

5          THE COURT:  The crux of the matter is you didn't come

6   to federal court and ask for an automatic stay; you went

7   someplace else.

8          MS. MENKES:  Your Honor, I've been practicing personal

9   injury law litigation for twenty years, and I've litigated

10  against entities during bankruptcy.  And if they have

11  insurance, it's an exception -- it's not property of the

12  estate.

13         THE COURT:  Not without coming to me.

14         MS. MENKES:  It's never been the -- it's never been an

15  issue.

16         THE COURT:  But you've been told already three times

17  that there's no insurance here.

18         MS. MENKES:  Well, I can address that, as well, Your

19  Honor.  I do not -- and my papers today go into the insurance

20  issue, and I think go into 523(e) issue.  I was -- state court,

21  I did go into the --

22         THE COURT:  That's not the issue today.  But go ahead.

23         MS. MENKES:  Okay.  In state court, I did go into

24  those issues.  They're not in my paper today.  They were argued

25  by the liquidating trustee, and that is not in the papers in

1     front of you right now.

2            For the first time, I received notice in the state

3     court action about the service because I did argue that the

4     debtor -- the creditor did not receive actual notice.  And the

5     attorney for the liquidating trustee showed me in her papers,

6     which she was opposing the stay, the actual notice.  The actual

7     notice is dated 2012.  In the -- it was sent to a Ronald Brophy

8     at decedents --

9            THE COURT:  I've looked at the docket.

10           MS. MENKES:  -- at the trustee's facility.

11           THE COURT:  I've looked at the docket.  Have you?

12           MS. MENKES:  I've looked at what I received.  I -- I

13    don't --

14           THE COURT:  So you didn't go on the Court's website,

15    and look it up yourself.

16           MS. MENKES:  I've looked at -- I've looked at what

17    I've received in the -- I just -- I just registered for the

18    electronic court's docket.  I don't --

19           THE COURT:  You can also come to court.  Okay.

20           MS. MENKES:  Mr. Brophy was a resident at Holy Family,

21    that's where this notice of the -- were served on him.  They

22    were served on him in 2011 and 2012.  Their own records

23    indicate that he left the facility June 7th, 2010, and he died

24    June 13th, 2010.

25           It also indicates that his next of kin is Elaine

1   Garvey.   Elaine Garvey had -- the second page of that letter

2   that was on the screen before is the -- her authorization to

3   get protected medical information regarding her father, and

4   it's clearly checked off for the purposes of litigation.

5           THE COURT:   What's the date of that letter?

6           MS. MENKES:   The letter is -- they're all in 2010,

7   they're all in before the bar date.  So I can look at it in my

8   papers, if you give me a minute.  The letters were dated -- was

9   letters to --

10          MS. SCHULTZ:   There's two, Your Honor.

11          MS. MENKES:   Yeah, both to --

12          MS. SCHULTZ:   The first one is October 18th, 2010, and

13  September 21st, 2010.

14          THE COURT:   Okay.

15          MS. MENKES:   And they're both accompanied by

16  authorizations from Ms. Garvey, saying that the purpose of

17  these -- the request is for litigation.  So that would

18  definitely make her a known creditor, and that was before the

19  bar date, before the action had started.

20          There -- she maintained her statutes of limitations in

21  state court, not knowing that there was a bankruptcy

22  proceeding.  Had she known, she would have filed the proper

23  documents.  She did not know.  And there are due process

24  considerations here.  I mean, it's two years later.  He was

25  dead.  He was dead at the time he was served.  I don't think

1    the debtor has done due diligence in locating, properly

2    locating a known creditor to the estate, and serving them with

3    actual notice.

4         THE COURT:  Did -- was -- did Holy Family respond to

5    that letter?

6         MS. MENKES:  They sent medical records.  They didn't

7    say -- that's all they did, they sent medical records.

8         And the request for medical records is never made to

9    an officer of the hospital; it's always made to medical

10   records.  And it would seem that, someone is requesting medical

11   records for the purpose of litigation --

12        THE COURT:  You don't assume anything.

13        MS. MENKES:  Well, due diligence would require a

14   medical records personnel who works for the -- for the estate

15   to see if it's for the purpose of litigation, to look at --

16        THE COURT:  But they acted in conformity with your

17   letter.  The letter requests medical records; you got the

18   medical records.

19        MS. MENKES:  Correct.

20        THE COURT:  Okay.

21        MS. MENKES:  Correct.  But it also advises them of a

22   known creditor to the estate.  And they served the decedent

23   after he was dead, and their own records show that he was dead,

24   and their own records show that he had left the facility before

25   the service of the notification.  So I don't see how there

44

 1  could possibly be good service on him.  I mean, they're

 2  required to do more than just --

 3          THE COURT:  No.  It says investigate claim, is what it

 4  said.  And they sent the information you needed to investigate

 5  a claim.

 6          MS. MENKES:  I'm talking about the trustee's -- the

 7  debtors' notification of the bar dates and the proceedings --

 8          THE COURT:  I hear you.

 9          MS. MENKES:  -- with Brophy.

10          THE COURT:  I hear you.

11          MS. MENKES:  And that was done in 2011 and 2012.  He

12  died in June 2010, and it's in their own facility's records.

13  And he left June 7th, 2010, again, in their own facility's

14  records.  And his next of kin is listed there.  His wife was

15  also listed there with an address.  I mean, had anyone known --

16  and when he was a resident there, he was suffering from

17  psychosis and dementia.  So even if he had not died and left --

18  I mean, people are in nursing homes because they require long-

19  term care, or even the community -- most nursing home residents

20  do suffer from dementia.  So it's certainly not due diligence

21  to serve somebody who may -- even if they're alive, may be

22  suffering, in their records, which it indicates, from psychosis

23  and dementia.  So I find that disingenuous.

24          THE COURT:  I don't think you're actually arguing the

25  law to me.  You're arguing a little emotion here.  Okay.  Keep

1    arguing.

2            MS. MENKES:  No, that's -- well, I'm explaining the

3    facts --

4            THE COURT:  I'm -- I heard.

5            MS. MENKES:  Okay.

6            THE COURT:  Keep talking to me.

7            MS. MENKES:  All right.

8            THE COURT:  You've heard the case law.  I'm not

9    hearing you respond to the case law.

10           MS. MENKES:  I think _Federated_ is on point.  I think

11   the other case that I put in my papers is on point.  There's an

12   absolute due process requirement that a known debtor --

13           THE COURT:  Have you listened to the requirements of

14   due process?  There's actual notice, which seems to me, from

15   what I've seen so far, and seeing the docket, it was given at

16   the last known address.  And then there's the constructive

17   notice, which it seems to me we have here, which is

18   publication.  And it was done, so that put the onus on, at

19   least from what I'm hearing, the constructive notice for an

20   unknown, which Ms. Garvey would be at this time, so ...

21           MS. MENKES:  Well, it's my position that she was a

22   known creditor, and she never received any --

23           THE COURT:  Okay.

24           MS. MENKES:  -- notification, as the trustee has

25   argued, that --

```
1          THE COURT:  That's your position.  Okay.  I'm hearing

2    you.  You have nothing else?

3          MS. MENKES:  No.  If she had received notification,

4    she would have -- when she retained me, she would have

5    proceeded with filing the claims.  I mean, the issues are

6    horrendous, as you can see in the papers, and --

7          THE COURT:  Well, not only was publication notice

8    given, Saint Vincents was an open and notorious case that was

9    often reported in the news.

10         MS. MENKES:  Well, he was a resident of Holy Family --

11         THE COURT:  Why did you do an order to show cause in

12   state court instead of coming to this Court?  What was your

13   purpose in doing that?

14         MS. MENKES:  Because at that point, I was under the

15   impression that there was property that was not part of the

16   estate, that there was insurance, if --

17         THE COURT:  After you had been told.

18         MS. MENKES:  I was given no supporting documentation.

19   I was just given a -- somebody told me something on the phone.

20   I was not -- never was sent any documents by the trustee, other

21   than threatening letters and copies of motions.  I was never

22   given bar dates, I was never given -- I had to do all that

23   research on my phone, to find out what was going on.

24         THE COURT:  I believe there was an affidavit included.

25   Okay.
```

47

1          MS. MENKES:  And I also did want to add that the

2    Bankruptcy Code --

3          THE COURT:  Did you stop and go look at the plan, the

4    bankruptcy plan?

5          MS. MENKES:  Your Honor, I did not do that.  I'm not a

6    bankruptcy attorney.  And this -- I thought it was outside of

7    the property of the estate.  And I certainly owe my client

8    zealous representation, and to maintain her causes of action,

9    because to not so is legal malpractice.  And I mean, I -- I

10   really believe that she was a known creditor, she did not

11   receive actual notice.  You can't notice a dead person.  And

12   the Bankruptcy Rule 3002 permits for late filing in the

13   interest of justice, and --

14         THE COURT:  And who explained that to you?

15         MS. MENKES:  I did research.  I was -- that's why I

16   asked for an adjournment, because I'm not a bankruptcy

17   attorney.  I spent my time -- I wanted to research that in

18   depth, by that -- but that was denied.  So I did as much

19   research as I could --

20         THE COURT:  Okay.

21         MS. MENKES:  -- in the time that I had.

22         THE COURT:  Anything else you wish to add?

23         MS. MENKES:  Oh, yes.  I do want to add -- yeah.  In

24   terms of the insurance, parties purchase insurance so, if there

25   is a claim, they don't have to pay out of their own pocket.  It

1  doesn't absolve them of liability.  If they have no insurance,

2  it doesn't mean that the claim goes away.  It means that they

3  are responsible from their own pocket, there's no insurance

4  policy that's going to pay for the liability.  So whether or

5  not there's insurance is not dispositive on whether or not

6  there's a claim.

7         THE COURT:  Except there's an automatic stay in place

8  in federal court.  I don't know -- there's an automatic stay,

9  there's a confirmed plan, there's a plan injunction in place.

10  I'm struggling to understand your argument.  I'm trying to

11  understand your argument, but I'm struggling with it.

12         MS. MENKES:  Well, the argument is that it was no

13  notice.

14         THE COURT:  There was a plan injunction, and there's a

15  discharge.

16         MS. MENKES:  But there was no notice of the plan to

17  this creditor.  That's -- there was --

18         THE COURT:  That's your -- that's your -- your real

19  basis before me today is that you are saying that Ms. Garvey

20  was entitled to actual notice --

21         MS. MENKES:  That's what I'm saying.

22         THE COURT:  -- and that's your -- that's the bottom

23  line of your argument.

24         MS. MENKES:  She was a known creditor, she was

25  entitled to actual notice.  The decedent was dead over a year

```
 1   when the notice was sent.
 2            THE COURT:  Very good.  I've heard you.  But we're
 3   here on an order to show cause, too, that went to state court.
 4            Yes, do you have anything you wish to add?  The Court
 5   will take a recess.
 6            MS. SCHULTZ:  No, Your Honor.
 7            THE COURT OFFICER:  All rise.
 8       (Recess taken at 11:50 a.m.)
 9       (Proceedings resume at 11:55 a.m.)
10       (Call to order of the Court.)
11            THE COURT:  Does anyone wish to add anything?
12            MS. MENKES:  Your Honor, I actually do wish to add
13   something.
14            THE COURT:  State your name for the record.
15            MS. MENKES:  Sheryl Menkes, attorney for Elaine
16   Garvey.
17            I was rereading my papers --
18            THE COURT:  Uh-huh.
19            MS. MENKES:  -- during this break, and I do believe
20   the cases are on point.  And I will tell you the cases with the
21   citations.  And -- okay.  ALMA, the AMF Bowling Centers --
22            THE COURT:  Right.  That was where no notice was given
23   at all, no publication notice, no -- any notice whatsoever.
24            MS. MENKES:  It was held that a personal injury
25   claimant would have no reason to a know a corporate debtor had
```

1    filed for bankruptcy without formal notice, and without formal

2    notice having been served prior to the bar date, plaintiff's

3    claim was not barred by the bankruptcy discharge.

4            And Federated, it was held that --

5            THE COURT:   That was the litigation that was started

6    prior to the filing of the Chapter 11.

7            MS. MENKES:   Right.   But it was held that the creditor

8    was aware of contingent liability, and so as the result, they

9    should have been served with formal notice.   Ms. Brophy's [sic]

10   authorization, stating that she was requesting medical records

11   for the purposes of litigation, gives knowledge of a contingent

12   claim, the same -- for the same way, the same way.   So the

13   contingent liability for the plaintiff's injury should not be -

14   - should not be barred.

15           And that's really all I have to say.   Procedurally, I

16   don't practice in Bankruptcy Court, so I've not -- I'm not

17   aware of all of the --

18           THE COURT:   You are a lawyer, so ...

19           MS. MENKES:   I am a lawyer, and I've -- my --

20           THE COURT:   Be careful around here.   Just be careful.

21   There are model rules called "competency," and I'm not so sure

22   you want to admit to some of these --

23           MS. MENKES:   Well, I --

24           THE COURT:   It's your duty to look at the procedures

25   and know them.   Okay.   You may be seated.

1          MS. MENKES:  All right.  Thank you.

2          THE COURT:  Ms. Schultz, do you have anything you wish

3    to add?

4          MS. SCHULTZ:  No, Your Honor.  Thank you.

5          THE COURT:  Very good.

6          The debtors in this case filed a petition under

7    Chapter 11 of the Bankruptcy Code on April the 14th, 2010.

8    Again, I noted earlier, it was pretty open and notorious, with

9    a lot of press coverage.  That doesn't mean notice, but there

10   was a lot of noise about this case.

11         Thereafter, certain bar dates were established.  The

12   first bar date for all general prepetition claims was ordered

13   on August the 12th, 2010, and set for October the 12th, 2010.

14   So bar dates in this case, October the 12th, 2010.  And that's

15   the last -- "bar date" means the last day to file claims.

16         The second last date to file claims was for

17   administrative claims that arose from the date of the petition

18   until May 31st, 2011.  That was ordered, and it was set for

19   August the 2nd, 2011.

20         Then there was a third bar date for administrative

21   claims that arose between June 1st, 2011, and April 30th, 2012,

22   and that was set for May the 21st, 2012.

23         And as has been stated on the record, the debtor had a

24   confirmed plan that went effective June the 29th, 2012.

25         Pursuant to that plan, the fourth last date to file

1   claims -- and these for administrative claims -- between May

2   1st, 2012, and the effective date of the plan was set for June

3   30th, 2012.

4          The trustee states and shows that the debtor served

5   the decedent with notice of the second, third, and fourth bar

6   dates, together with the plan, at the decedent's last known

7   address.  In addition, the trustee states that the notice of

8   the first and second bar dates were given by publication notice

9   in the New York Times and the New York Post.

10         On April the 13th, the trustee learned that certain

11  debtors, Saint Vincents Catholic Medical Center and Holy Family

12  Home, had been named as defendants in a lawsuit brought by the

13  plaintiff.  The trustee, according to the affidavit and what

14  I've heard in court today, reached out to plaintiff's counsel,

15  informing her that the lawsuit was a violation of the automatic

16  stay and plan injunction, and requested that the action be

17  discontinued.  The response was a request that the automatic

18  stay be lifted to proceed against the insurance proceeds or the

19  insurance company, a decision that is clearly only for this

20  Court.  After the trustee investigation into available

21  insurance, the trustee responded with a letter, indicating that

22  no insurance was available, and the lawsuit was never

23  discontinued.

24         The trustee also contends that Attorney Menkes has

25  engaged in dilatory tactics, to delay the filing of the instant

1  motion to enforce a plan injunction, and has utterly

2  disregarded this Court's injunction.  Supporting this

3  contention is the fact that Attorney Menkes filed an order to

4  show cause in state court at the end of June in 2013, and then

5  served the order on the trustee July the 18th, 2013.  The

6  purpose of the order to show cause, which required an

7  appearance by the trustee on July the 31st, 2013, was to ask

8  the state court to enter an order compelling the trustee to

9  lift the stay on plaintiff's personal injury claim.

10         Again, I have to admit to being a little perplexed

11 here, to have a state court or anyone besides a federal

12 bankruptcy court or a federal court lift the stay.  That

13 perplexes me that that was even argued.

14         Attorney Menkes has requested an adjournment in the

15 matter presently before this Court, and that -- the Court --

16 that was rejected by this Court.

17         I have received opposition to the trustee's motion,

18 which focuses on the fact that her client lacked notice of the

19 bankruptcy or relevant bar dates.  Specifically, the opposition

20 indicates that service on the decedent was made at 1740 84th

21 Street, Brooklyn, New York, which is the address of one of the

22 debtors, and that the decedent was discharged from the facility

23 on June 7th, 2007.  And that, basically, is the crux of our

24 issue.

25         The issue before the Court today, that it's being

Court Decision                                    54

1   asked to decide, is whether the plaintiff can continue with her

2   state court lawsuits against the debtors.  Directly applicable

3   is Section 11.3 of the debtors' confirmed plan, which went into

4   effect on June 29th, 2012, which states that:

5           "Any injunction or stay arising under Section 105 or

6           Section 362 of the Bankruptcy Code shall remain in

7           full force and effect until the closing of the Chapter

8           11 case."

9           Furthermore, Section 1104 states that:

10          "Pursuant to the Bankruptcy Code Section 1141(b), the

11          distributions, rights, and treatments provided in the

12          plan shall be in complete satisfaction, discharge, and

13          release any claims and causes of action, whether known

14          or unknown, against the debtors."

15          I cite from DePippo v. Kmart, 335 B.R. 290, which

16  says:

17          "It is well established that, once confirmed, a

18          debtors' reorganization plan binds the debtor and all

19          creditors, regardless of whether the creditor has

20          accepted the plan, provided that that creditor has

21          been given sufficient notice to satisfy due process.

22          If due process is satisfied, an order confirming a

23          reorganization operates to discharged all unsecured

24          debts or liabilities, even those of a tort victim who

25          was unaware of the debtor's bankruptcy."

1        Again, that's from DePippo v. Kmart.

2        Notice sufficient to satisfy due process is not the

3        same for all creditors.  Non-creditors must be given

4        direct notice by mail, while publication notice is

5        generally sufficient for unknown creditors."

6        Curatola v. Saint Vincents, that is a 2008 Westlaw,

7  1721471 (S.D.N.Y. 2008), where they -- that case cites Mullane

8  v. Central Hanover Bank and Trust Company, which is a United

9  States Supreme Court decision at 339 U.S. 306.

10       "A known creditor is one whose identity is either

11       known or reasonably ascertainable by the debtor,

12       someone who can be identified through reasonable,

13       diligent efforts.  Conversely, a creditor is unknown

14       if its interests are either conjectural or future or,

15       although they could have been discovered upon

16       investigation, do not, in due course of business, come

17       to the knowledge of the debtor.  Importantly, while a

18       debtor must directly notify entities identified as

19       creditors in the debtor's record, a debtor is not

20       required to search elsewhere for those who might have

21       been injured.  In other words, a debtor need not be

22       omnipotent or clairvoyant.  They need only do what is

23       reasonable under the circumstances to provide notice

24       to ascertainable creditors."

25       The plaintiff must first file a complaint against

1   multiple debtor-defendants -- excuse me.

2            The plaintiff first filed a complaint against multiple

3   debtor-defendants in May of 2013.  And the complaint was sent

4   to counsel for the trustee on or about June 5th, 2013.

5            A few years before filing the complaint, the plaintiff

6   also sent one letter to Holy Family Home, one of the debtor-

7   defendants, on July the 23rd, 2010, and two letters to Saint

8   Vincents Catholic Medical Centers, the other defendant-debtor,

9   on September the 10th, 2010, and October the 18th, 2010.  Each

10  of those letters indicates that the plaintiff sought -- and I

11  quote from the letter:

12            "-- to investigate claims of nursing home abuse and

13            negligence that occurred to Ronald Brophy when he was

14            a resident at Holy Family Home."

15           In response to those letters, it may be that the

16  debtor added the decedent to the service list -- and I think

17  that they would not know that the decedent was, at that time,

18  deceased.  And thereafter, the decedent mailed notice of the

19  second, third, and fourth bar dates, in addition to the

20  occurrence of the effective date of the plan.  I've heard today

21  from Attorney Menkes that, in response to the letter, the

22  medical records were sent to the plaintiff.

23           The only shred of evidence to support an assertion

24  that the plaintiff was a known creditor are the three letters

25  sent to the debtor -- debtor entities in July, September, and

Court Decision                                             57

1   October in 2010.  These letters stated that they are sent to --

2   again, I quote -- "investigate claims of nursing home abuse,"

3   and that is distinguishable from demand for payment evidencing

4   a claim or some communication with the debtor concerning the

5   existence of the creditor's claim.  And that's Drexel Burnham

6   Lambert, 151 B.R. 674 (S.D.N.Y. 1993).

7               "To be a known creditor, the debtor must have in its

8               position, at the very least, some specific information

9               that reasonably suggests that both the claim for which

10              the debtor may be liable and the entity to whom it

11              will be liable."

12              In Re Crystal Oil, 158 F.2d 293, which is a Fifth

13  Circuit opinion.

14              "The Court finds these letters insufficient to set

15              forth facts or information that reasonably indicate

16              plaintiff's intention to file or otherwise prosecute a

17              future claim against the debtor."

18              Another case, In Re Trump Taj Mahal Associates, 156

19  B.R. 928, a District of -- Bankruptcy Court in N.J., 1993,

20  finding that:

21              "A creditor who sent a letter to the debtor regarding

22              a possible claim was not a known creditor, as many

23              people threatened to file suit, although only a

24              nominal number, if any, actually brang suit."

25              Even if one believes that the plaintiff was a known

1  creditor, the debtors sent direct mail notice to the decedent

2  at the decedent's last known address.

3          "To determine whether notice in this manner was

4          reasonably given, the proper inquiry is whether the

5          noticing party acted reasonably in selecting means

6          likely to inform persons affected, not whether a

7          particular party actually received the notice."

8          That's In Re Richie Risk-Linked Strategies Trading,

9  471 B.R. 331, again citing a Second Circuit decision, Weigner

10 v. The City of New York, 852 F.2d 646.

11         "When evaluating service, the noticing party must use

12         reasonable, diligent efforts, which does not mean that

13         the noticing party must conduct impracticable and

14         extended searches in the name of due process.

15         Instead, reasonable diligence involves a search

16         focused on the debtor's own books and records."

17         The trustee indicated that it sent notice of the

18 various bar dates and the effective date of the plan to the

19 decedent's last known address.  This address was, therefore,

20 what the trustee had in their books and records at the time

21 notice was effectuated, requiring the trustee to contact every

22 party who was either a resident in one of the debtors' nursing

23 homes, or otherwise a patient in one of the debtors' hospitals.

24         "To determine whether the address on file was the

25         current address or an impracticable extended search

Court Decision                                                    59

1          that" -- "is an impracticable and extended search that

2          would completely vitiate the important goal of prompt

3          and effectual administration and settlement of the

4          debtor's estate."

5          See USH, 223 B.R. 654 (S.D.N.Y).

6          Coupled with publication notice of the various bar

7    dates, this Court believes that notice was reasonably given and

8    was sufficient under the circumstances.  The plaintiff in this

9    action was more likely an unknown creditor, as plaintiff's

10   lawsuit had not been filed as of the time of the bar date

11   notices were set and served.

12         As the District Court in Curatola v. Saint Vincents

13   Catholic Medical Centers of New York stated, the creditor in

14   that action could not have been known -- a known creditor

15   because she had not yet filed a negligence claim against Saint

16   Vincents.  That's a Southern District of New York 2008 case,

17   2008 WL 1721471.

18         Therefore, having not filed a complaint against the

19   debtors, it was not the debtors' duty ...

20         "-- to search out each conceivable or possible

21         creditor and urge that person or entity to make a

22         claim against it."

23         In Re Brooks Fashions, 224 B.R. 436, a Southern

24   District of New York case.

25         Given the plaintiff's status as an unknown creditor,

1   constructive notice of the bar date claim -- bar claims date by

2   publication satisfies the requirement of due process.  Chimiron

3   Corp. v. Jones (phonetic), 72 F.3d 349 (3d Cir. 1995); Mullane

4   v. Central Hanover Trust, 339 U.S., Supreme Court case found at

5   306, 1950.

6         As notice was sufficient as to the plaintiff, the

7   confirmed plan and the provisions therein; namely, the plan

8   injunction and extensions of the automatic stay bar the

9   plaintiff from continuing the state court lawsuit, the trustee

10   has requested fees for prosecuting this action.

11         The fees are necessary and were necessary to defend

12   the state court order to show cause.  That action was clear and

13   blatant violation of the automatic stay.

14         Ms. Schultz, I'm at a bit of an issue here.  How much

15   -- I need to separate the costs here.  To defend the state

16   court action and the automatic stay, you are entitled to fees

17   and expenses for doing that, and I will grant those.

18         I have a bit -- not a dilemma, but I'm sort of at a

19   crosswords -- crossroads here.  Had a motion been filed here

20   for the automatic stay and enforcement of the plan injunction

21   might have been a routine business and properly brought here,

22   you might not have been entitled to fees.  So I'm struggling.

23   I will give you fees and expenses for all the state court work

24   that you had to do.  Do you have any ball park idea of how much

25   that would be?

1        MS. SCHULTZ:  Your Honor, I don't know how much our

2   state court work is.  What I would propose is that we put

3   together a schedule --

4        THE COURT:  Okay.

5        MS. SCHULTZ:  -- for Your Honor, and we can copy Ms.

6   Menkes on it; send it to chambers, if that's acceptable, as we

7   would normally submit an order.  I think that would give you an

8   idea of precisely --

9        THE COURT:  And would you --

10        MS. SCHULTZ:  -- how much time and expenses --

11        THE COURT:  -- break it down for me?

12        MS. SCHULTZ:  Absolutely, Your Honor.

13        THE COURT:  Because had this been a legitimate motion

14   for -- to lift the stay, there would be some expenses that

15   would not have been attributable to the plaintiff in the state

16   court action.

17        MS. SCHULTZ:  Yes, Your Honor.  We understand.

18        THE COURT:  So if you'll break those down that way, I

19   can have a hearing on it or I can do it on the papers.  But I

20   am -- I'm definitely awarding fees for all the state court

21   matters.  I will reserve rewarding fees on any of the

22   injunction matters and the motion to -- for the injunction at

23   this time.

24        MS. SCHULTZ:  We understand, Your Honor.  Would it be

25   acceptable if we submitted those within seven days?

1        THE COURT:  I think I would really like to have those

2   filed on ECF.

3        MS. SCHULTZ:  Okay.

4        THE COURT:  I want them to be open and notorious; I

5   don't want them just sent to chambers.  But I think you -- yes,

6   on seven days.  And I want you to give Ms. Menkes a copy of

7   that.  And Ms. Menkes, I will allow you to respond --

8        MS. MENKES:  Thank you, Your Honor.

9        THE COURT:  -- to the expenses.

10       MS. SCHULTZ:  Your Honor, can we submit that in the

11  form of an affidavit from myself?

12       THE COURT:  Yes.  But I want an order of the violation

13  of the stay of the state court matters.  And like I say, I --

14  there is, also, a violation of the plan injunction.  I want to

15  -- again, I -- you can hear I'm struggling.

16       I -- Ms. Menkes, I do not like to reward people that

17  do not understand the procedures of any court that they are in

18  front of.  You may understand state court procedures.  But if

19  you come to a federal bankruptcy court, you need to have dealt

20  with -- at least talked to someone.  There is a model rule of

21  competence that -- I'm not there, I'm not trying to push it.

22  But competence is 101 of the Model Rules of Professional

23  Responsibility and --

24       MS. MENKES:  Your Honor, I'll -- in response, I'll say

25  my research, I have Court of Appeals cases saying there's

1   concurrent jurisdiction in how the bankruptcy affects third

2   persons.  Gordon v. -- I forget the name.  And that's why I

3   proceeded in state court.

4           THE COURT:  I have already heard your arguments.  I

5   have discounted your arguments.  I have made my ruling.

6           MS. MENKES:  No, fine.  I didn't bring that up before,

7   but I --

8           THE COURT:  There is a possibility of concurrent

9   jurisdiction in certain matters, but that is not where we are

10  here, and that's not what I had in front of me.

11          So I'm sorry to be struggling, that I can't do this

12  clear-cut.  But I -- honestly, Ms. Menkes, you have heard the

13  arguments today.  I can tell you, that's expensive argument.

14  It's taken a lot of work for Ms. Schultz and her firm to bring

15  that argument.  I understand that.

16          And what I am -- I will be candid with everybody in

17  the room.  What I am struggling with is that I understand,

18  looking at your letterhead, that you're a sole practitioner,

19  and you had an argument that did at least raise to the level of

20  what needed to be brought to this Court in the first place.  I

21  do also understand that, when people work hard, they need to be

22  paid for what they do.  And Ms. Schultz and her firm had to

23  work hard to get here today.  So I -- so it's not just the

24  fees, what is reasonable for reimbursement -- and I know your -

25  - what is your going rate, Ms. Schultz?

Court Decision                                          64

1                MS. SCHULTZ:  Eight hundred and fifty dollars  an hour,

2       Your Honor.

3                THE COURT:  That's what I thought.  So court is in

4       dismissed -- court is adjourned.

5                THE COURT OFFICER:  All rise.

6            (Proceedings concluded at 12:22 p.m.)

7                                *****

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:13-cv-06902-PKC   Document 16-18   Filed 05/16/14   Page 31 of 31
10-11963-cgm   Doc 3663   Filed 08/20/13   Entered 08/20/13 15:56:28   Main Document
Pg 65 of 65

65

1               CERTIFICATION

2          I certify that the foregoing is a correct transcript

3   from the electronic sound recording of the proceedings in the

4   above-entitled matter to the best of my knowledge and ability.

5

6

7

8

9   _____        August 19, 2013

10  Coleen Rand, AAERT Cert. No. 341

11  Certified Court Transcriptionist

12  AudioEdge Transcription, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25