1    seeking a stay must also establish that the non-moving

2    party or other parties will not suffer substantial

3    harm if the stay is granted.  In other words, the

4    moving party must show that the balance of harms tips

5    in favor of granting the stay."

6        Again, Adelphia Communications Corp.

7        In this case, if a stay of this court order enforcing

8    the plan injunction is granted, the state court action will not

9    be enjoined, and the liquidating trustee be -- will be forced

10   to continue defending the appellant's claim outside of this

11   court.

12       "The liquidation costs that would be required will

13       deplete the assets of the liquidating trust and

14       diminish recoveries for the debtors' creditors.  This

15       constitutes substantial harm."

16       MF Global, 2012 WL 5386101.

17       The effect -- and I quote from that:

18       "The effect of a stay would increase potential

19       litigation costs and minimize return to the estate,

20       causing substantial injury which could otherwise be

21       avoided to the estate.  This factor weighs against

22       granting a stay."

23       Public interest.

24       "The final factor considers the interest of third

25       parties who act in reliance on the Bankruptcy Court's

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 2 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 66 of 132

66

1      ruling."

2      In Re Moreau, 135 B.R. 209 (Bankr. N.D.N.Y. 1992).

3      "Consideration of the public interest factor may turn

4      on the finality of certain bankruptcy proceedings or

5      whether the importance of obtaining clarification of

6      the law requires the protection of a party's interest

7      during the appeal process."

8      WestPoint Stevens, 2007 WL 1346616 (S.D.N.Y. 2007).

9      "The public interest factor favors the expedient

10     administration of bankruptcy proceedings."

11     Adelphia Communications, In Re Savage Associates.

12     "In addition, there is a strong public interest in

13     maximizing the return to creditors in a bankruptcy."

14     MF Global, 2012 WL 5386101.

15     "Although there is also a public interest in ensuring

16     that matters are properly resolved on appeal, the

17     former interest outweighs the latter."

18     In Re Metiom, Inc., 318 B.R. 263 (S.D.N.Y. 2004).

19     Quote:

20     "This Court finds that the public interest in the

21     expeditious administration of bankruptcy cases, as

22     well as in the preservation of the bankruptcy assets

23     for the purpose of paying creditors, rather than

24     litigation of claims lacking a substantial possibility

25     of success, outweighs the public interest in resolving

1          the issues presented here on appeal."

2          The Court finds that the public interest weighs

3   against granting a stay.  Each of the four factors weighs

4   against granting a stay pending appeal.  The motion is denied.

5   Submit an order.

6          Very good.  That finishes all our contested matters?

7          MS. SCHULTZ:  No, Your Honor.  That finishes the

8   contested matters wherein Akin Gump is representing the

9   liquidating trust.  Mr. Oswald also has a matter set for

10  hearing.

11         THE COURT:  Yes, I'm ready for that one.

12         MS. SCHULTZ:  And I would ask, Your Honor, may I be

13  excused, since I'm not involved in that particular proceeding?

14         THE COURT:  Yes, you may be excused.

15         MS. SCHULTZ:  Thank you, Your Honor.

16         THE COURT:  Thank you.

17         Yes, sir.

18         MR. OSWALD:  Good afternoon, Your Honor.  Frank Oswald

19  again for Togut Segal.  My colleagues David Smith and Lara

20  Sheikh.  Just as an overview -- and Mr. Davis is here,

21  obviously, for AIG.

22         THE COURT:  Right.

23         MR. OSWALD:  So I was last before you at the July

24  conference on the nine proofs of claim filed by AIG or its

25  predecessor, which might be known as Chartis and other names.

Case 1:13-cv-06902-PKC  Document 16-26  Filed 05/16/14  Page 4 of 39
10-11963-cgm  Doc 3720  Filed 09/23/13  Entered 09/23/13 15:38:09  Main Document
Pg 68 of 132

68

1   And the gravamen of what you heard at that hearing was we

2   needed to know what these claims were.  And we've been trying

3   to get at what the claims -- the components, the amounts, and

4   the bases.  And at Your Honor's direction, we sat in court and

5   negotiated a scheduling order that dealt with that piece, as

6   well as the matter that's in front of you today.

7         So let me just say, with regard to getting the claim

8   information, Mr. Davis did provide us with a comprehensive

9   letter in early August.  We've got these two components of the

10  claim; basically, the workers' comp component, the malpractice

11  component.

12        The importance of the claims to the estate, of course,

13  is that there is collateral that's been posted with the non-

14  debtor affiliate.  And to the extent that collateral is not

15  needed, that collateral will be released upstream to us and

16  distributed to the creditor body.  It's a little less than $40

17  million.

18        The Court has heard that, prior to the -- my firm

19  getting involved in what's now the contested claims, is that

20  the parties had a long, twenty-plus-year history of working

21  together to set reserves, look at these claims as they come

22  due.

23        And sometime, while the plan negotiations were hot and

24  heavy, the request to release some of the collateral at that

25  time to facilitate those negotiations and plan confirmation led

1   to a -- what I'll say is a renewed look at the reserves.  And
2   we went from 10 million or so in reserves to 20 million.  I
3   believe the current reserves now have been upped to close to --
4          THE COURT:  I'm a little confused.  This is not your
5   motion.
6          MR. OSWALD:  Yes, this is -- well, I wanted to lay the
7   -- the way we left it was we would provide a position letter to
8   Mr. Davis regarding what the motion is about.  And what the
9   motion is about whether or not certain of these claims are
10  subject to the collateral.  And I was just leading to the --
11  how we got to today's motion.
12         THE COURT:  Okay.
13         MR. OSWALD:  If that's not helpful, I can stop on
14  that.
15         THE COURT:  It's not helpful at this moment.  It will
16  be helpful in a minute, but not at this moment.  There are some
17  things I want to ask first.
18         MR. OSWALD:  Uh-huh.
19         THE COURT:  And I'm going to let you answer at counsel
20  table.  But the first thing I'm going to do is I want to do a
21  factual background, and I want to be corrected if my factual
22  background is wrong.  And you were beginning to repeat some of
23  that.  So I want y'all to listen carefully.
24         So Saint Vincents Catholic Medical Center of New York,
25  and often referred to as "SVCMC," or the debtors, was formed

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 6 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 70 of 132

70

1    pursuant to a merger in 2000, between Catholic Medical Center;

2    "CMC," and Saint Vincents Hospital, "CVH" [sic], and multiple

3    other entities.  The multiple other entities, we're not

4    necessarily dealing with; it had nothing to do with this.  Am I

5    correct?

6         MR. DAVIS:  As to the other entities, they have

7    nothing to do with today's motion.

8         THE COURT:  For the purpose of this motion, the

9    relevant predecessor entities are Catholic Medical Center and

10   Saint Vincents Hospital.  And you've just confirmed that.

11        AGI -- AIG, excuse me, began providing commercial

12   insurance to both Catholic Medical Centers and Saint Vincents

13   Hospital in the '90s, 1990s.

14        MR. DAVIS:  Yes, Your Honor.

15        THE COURT:  AIG's insurance relationship with these

16   entities continued until Catholic Medical Centers and Saint

17   Vincents Hospital merged to become what would later be the

18   debtors in 2000.

19        MR. DAVIS:  Yes, Your Honor.

20        THE COURT:  Post-merger, AIG continued providing

21   insurance for the debtors.  In the debtors' first bankruptcy

22   case, filed in 2005, the debtors assumed the contracts relevant

23   to AIG and Saint Vincents Catholic Medical Centers.

24        MR. DAVIS:  Yes, Your Honor.

25        THE COURT:  So that insurance relationship continued.

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 7 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 71 of 132

71

1        MR. DAVIS:  Yes.

2        THE COURT:  So during the course of the debtors'

3    second bankruptcy, multiple orders have been entered that

4    pertained to this insurance relationship.

5        MR. DAVIS:  Yes.  I wouldn't want to think that

6    they're broad in implication.  They were specific to renewals.

7        THE COURT:  Okay.  This is the one I want to talk

8    about.  A stipulation between AIG and the debtors was so

9    ordered by this Court on September the 9th, 2010.  This

10   stipulation included a whereas clause stating the following:

11       "Whereas the debtors received a notice of premium due

12            for the policy periods ranging from April the 1st,

13            1995 and April the 1st, 1999, with respect to Chartis

14            Insurance Contract Nos. 209400, 209401, 209402,

15            209403, and its termed 'The 1995-1999 Prepetition

16            Insurance Program,' and on or about July the 9th,

17            2010, the debtors informed the insurer that the merits

18            of that amount sought was disputed."

19       So the parties agree that the present issue before

20   this Court relates to certain losses that were incurred by

21   Saint Vincents Hospital between 1999 -- excuse me -- 1995 and

22   1998; that these losses occurred before the merger that created

23   Saint Vincents Catholic Medical Center.

24       MR. DAVIS:  Yes, Your Honor.

25       THE COURT:  And the debtors do not dispute that AIG

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 8 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 72 of 132

72

1    has a claim against the debtors for this loss.

2              MR. OSWALD:  Correct.

3              THE COURT:  What the debtors dispute is whether AIG

4    has a direct claim against a non-debtor, wholly owned

5    subsidiary of the debtors, the QIL; Queensbrook Insurance,

6    Limited.

7              MR. OSWALD:  Both whether there's a direct claim, and

8    we say the claim is against the debtors; and then, more

9    specifically, whether or not the QIL collateral backstops those

10   claims.

11             THE COURT:  That's my next one.  The debtors also

12   dispute whether AIG has a claim against any collateral held by

13   QIL.

14             MR. OSWALD:  For that period.

15             THE COURT:  For that period only.

16             MR. DAVIS:  Your Honor, the term "collateral" can be

17   misconstrued.  A letter of credit is, technically, not property

18   of the estate; and, therefore, I would prefer, for clarity,

19   that we say that we have a claim against the letter of credit.

20             THE COURT:  And would you clarify that the Chartis

21   contracts are for the Saint Vincents Hospital losses?

22             MR. DAVIS:  The issue today is for the Saint Vincents

23   Hospital losses, correct.

24             THE COURT:  Okay.  And QIL is a wholly owned insurance

25   subsidiary of the debtors.  QIL is not a debtor in the

1   bankruptcy case, and it is prohibited from being a debtor under

2   Section 109 of the Bankruptcy Code.

3          QIL was created in 1998, prior to the merger of Saint

4   Vincents Catholic Medical Center.  And at the time of the

5   formation, QIL was only a wholly owned subsidiary of Catholic

6   Medical Centers, a predecessor entity of Saint Vincents

7   Catholic Medical Center.

8          MR. OSWALD:  That's correct.

9          MR. DAVIS:  I can't disagree with some of those

10  particulars, but I didn't know the date of creation, nor did I

11  know the ownership prior to the merger.  But I don't have any

12  reason to dispute it, either.

13         THE COURT:  If you do so, I'd like to know in writing

14  soon.

15         MR. DAVIS:  No, I -- I don't believe I do have a

16  reason to; I just don't happen to you know.  You know, I --

17         THE COURT:  Okay.  So QIL was created for the express

18  purpose of paying all of Catholic Medical Centers deductibles

19  and losses to AIG, and Catholic Medical Center collateralized

20  its obligations to AIG with cash and letters of credit provided

21  by QIL, and that's called the "QIL Collateral," or referred to

22  as the "QIL Collateral."

23         MR. DAVIS:  Again, I don't know that that was the only

24  purpose for which QIL was formed.

25         THE COURT:  As of the petition date, two letters of

1   credit in AIG's favor aggregate thirty-seven million, eight

2   hundred and fifty-three dollars and seven -- excuse me -- eight

3   hundred and fifty-three thousand, seven hundred and two

4   dollars.  And there was eighty-eight hundred and fourteen

5   thousand six hundred and eighty-four dollars [sic] being held.

6              MR. DAVIS:  In cash.

7              THE COURT:  In cash.

8              MR. DAVIS:  I can't confirm the number, but I don't

9   have any reason to disagree with it, either.  And I know it's

10  in -- in the order of magnitude, it's correct.

11             THE COURT:  The letters of credit and cash act as a

12  reserve for any losses incurred by AIG.  And every year, AIG

13  has designated a certain amount of the QIL collateral to be

14  held in reserve.

15             MR. DAVIS:  Your Honor, could you repeat that?  I'm

16  not sure I understand it.

17             THE COURT:  Sure.  I'd be delighted.

18             These letters of credit -- and again, that was the

19  petition date, but just referring to the letters of credit in

20  general -- and cash act as a reserve for any losses occurred --

21  incurred by AIG.  And every year, AIG has designated a certain

22  amount of QIL collateral to be held in reserve.

23             MR. DAVIS:  Two comments about that.

24             THE COURT:  Okay.

25             MR. DAVIS:  First is, it's designated as security.

1    I'm not sure I know what the word "reserve" means, and I could

2    be -- it could have more than one meaning.

3         And second, each year, upon renewal or approximately,

4    the parties agreed on the amount.  It wasn't designated by AIG;

5    it was an agreement.  I can show you an example.  There's one

6    annexed to the motion.

7         THE COURT:  Okay.  And based on the debtors' papers,

8    as of June the 30th, 2011, AIG and the debtors agreed to

9    establish total reserves in the amount of forty percent of the

10   QIL collateral, which was approximately $16 million.

11        MR. DAVIS:  I don't know that at all, Your Honor.  And

12   our present position is that the reserve requirements are

13   considerably higher, particularly given that medical

14   malpractice claims were stayed by this -- by this case; and

15   therefore, the growth in medical malpractice exposure has been

16   unpredictable.

17        THE COURT:  That was as of 2011.

18        MR. DAVIS:  I don't know, Your Honor.  I don't know

19   that fact.

20        THE COURT:  Okay.  And then the --

21        MR. OSWALD:  From the debtors' perspective, Your

22   Honor, the June 30 numbers are agreed-upon numbers, as was done

23   --

24        THE COURT:  And do you have --

25        MR. OSWALD:  -- in the ordinary course.

1      THE COURT:  -- documentation on that?

2      MR. OSWALD:  I'm sure we do.

3      THE COURT:  Okay.  If you'll make sure he sees it.

4      But then the debtors' papers also have indicated that

5  AIG has increased reserves to approximately 22.5 million by

6  February the 28th, 2013.  And it seems the amount of reserve

7  held by AIG has increased even more, and may be at 31.8 million

8  by August the 8th, 2013.

9      MR. DAVIS:  And the word "reserves" has an ambiguity

10  in it, and that's, I think, what the problem may be, in terms

11  of why those numbers seem striking.

12      There are two kinds of reserves; there are incurred

13  reserves, and there are reserves for losses that are incurred,

14  but not reported.  The incurred reserves are the number that

15  the parties measure and can agree upon and can identify, and

16  it's based on known claims and known facts.

17      In addition to that, actuaries do predictions for

18  losses that are either not reported or under-reported, or

19  subject to loss development.  And either of those --

20      THE COURT:  I heard you.

21      MR. DAVIS:  Either of those can be reserves.

22      THE COURT:  I'm doing big picture.  I heard you.

23      MR. DAVIS:  Yeah.

24      THE COURT:  The key dispute between the parties is

25  whether the Saint Vincents losses are covered under any

1   agreement between AIG and Saint Vincents Catholic Medical

2   Centers as successor to the Catholic Medical Center, the

3   original party who entered into the agreement with QIL.

4           AIG concedes that Saint Vincents Hospital was never a

5   party to the relevant agreements.  Instead, AIG then argues

6   that Saint Vincents Hospital merged into Saint Vincents

7   Catholic Medical Center, and Saint Vincents Catholic Medical

8   Center renewed the policy year after year.  As a result, AIG

9   states that it can draw down on the QIL letters of credit as a

10  reserve against Saint Vincents Hospital's losses.

11          MR. DAVIS:  Your Honor, there are two explicit

12  provisions which I'd like to point to, which support that

13  conclusion.

14          THE COURT:  Okay.

15          MR. DAVIS:  Do you want to do that now?

16          THE COURT:  We'll get there.

17          MR. DAVIS:  Okay.

18          THE COURT:  We'll get there.

19          In a stipulation between the debtors and AIG dated

20  September the 10th, 2010, the parties agreed to a new

21  arbitration agreement for all claims that AIG has against the

22  debtor, except -- and I want to read this carefully.  So there

23  was a stipulation between the debtor and AIG dated September

24  the 10th, 2010.

25          The parties agreed to a new arbitration agreement for

1   all claims that AIG had against the debtor, except, however --

2   and this goes back to what I said at the beginning -- Chartis

3   Insurance Contract Nos. 209400, 209401, 209402, and 209403 are

4   expressly precluded from the arbitration agreement, and the

5   parties expressly reserve their respective rights, if any, with

6   respect to those contracts and claims, if any, thereunder;

7   including, without limitation, the insurer's right to seek

8   arbitration of all -- of any alleged disputes arising from or

9   relating to the 1995-1999 prepetition insurance program,

10  separately or in conjunction with any arbitration, pursuant to

11  the arbitration agreement and the rights of the debtors and

12  other parties-in-interest to object to such arbitration.   In

13  other words, the present claim is issue -- at issue is the only

14  claim that is not in arbitration and part of the QIL

15  collateral.   Is that correct?

16          MR. DAVIS:   No.   The conclusion is not correct.   The

17  facts are correct.   The -- we have the right to arbitration in

18  a preexisting agreement and in a separate agreement.   We have

19  it in two agreements, both of which I can show Your Honor.   And

20  the new arbitration agreement doesn't cover it, has no -- and

21  as you correctly point out, the new arbitration agreement is

22  not a basis to seek arbitration, nor is it mentioned in our

23  papers, except to point out that we're not relying on it.   It's

24  the old arbitration --

25          THE COURT:   I think you misunderstood.

1        MR. DAVIS:  Okay.

2        THE COURT:  Let me reread it.

3        In a stipulation between the debtors --

4        MR. DAVIS:  Uh-huh.

5        THE COURT:  -- and AIG, dated September the 10th,

6    2010, the parties agreed to a new arbitration agreement for all

7    claims that AIG has against the debtor, except those Chartis

8    Insurance contracts that I read --

9        MR. DAVIS:  Right.  I understand everything you read,

10   Your Honor, was correct.  It was the -- when you said

11   "therefore," and you stated a conclusion that I disagreed with

12   the conclusion.

13       THE COURT:  I didn't state "therefore," I said

14   "however."

15       MR. DAVIS:  Well, perhaps --

16       THE COURT:  There was no "therefore" in that sentence.

17       MR. DAVIS:  But after you -- after you were done

18   quoting it, you then said -- added an additional sentence.  It

19   was the additional sentence.

20       THE COURT:  In the -- "in other words," is what I

21   said.

22       MR. DAVIS:  Right.

23       THE COURT:  The present claims at issue are the only

24   claims that are not in arbitration and part of the QIL

25   collateral.  That's all I said.

1        MR. DAVIS:  I don't understand that sentence, but I

2    would -- I would say that the present claims are subject to the

3    QIL collateral and are subject to arbitration, and I'm prepared

4    to show why both of those statements are our position.

5        THE COURT:  Okay.  I have questions for you.  I'm not

6    here for arguments, I'm here for questions.

7        MR. DAVIS:  Okay.

8        THE COURT:  I want you both to answer this, but I want

9    you to go first.

10        MR. DAVIS:  Certainly.

11        THE COURT:  Are the Saint Vincents Hospital losses

12    related to the Chartis Insurance Contracts 209400 through

13    209403, for policy periods ranging from April the 1st, 1995

14    through April the 1st, 1999?

15        MR. DAVIS:  Those are exactly the -- the losses we're

16    putting at issue in this motion.

17        MR. OSWALD:  Correct, Your Honor.

18        THE COURT:  Okay.  For you, AIG.  Is this properly

19    before the Court as a contested matter?  What about Rule 7001,

20    which is what is an adversary?  And aren't you asking for a

21    declaratory judgment that the QIL letters of credit are

22    security for your claim, and why does this not require an

23    adversary?

24        MR. DAVIS:  Your Honor, we didn't wish to bring this

25    motion; we were ordered to bring this motion.  We do not think

1   this Court has jurisdiction today.

2            THE COURT:  All right.

3            MR. DAVIS:  And we certainly think the Court lacks

4   jurisdiction over the counterclaim.

5            THE COURT:  The scheduling order said it was a

6   contested matter.  Do you both agree that the issue before the

7   Court can be resolved by way of a contested matter, instead of

8   an adversary?

9            MR. OSWALD:  I do, Your Honor.  I mean, again,

10  harkening back to the July conference and the several issues

11  that were raised there, first and foremost was getting a clear,

12  concise statement of the claims, together with the backup.  And

13  then we indicated as an initial -- because, as I said before,

14  once we got a clear and concise statement of the claims with

15  the backup, the parties might not be as far apart as we thought

16  we were.

17           One example, Your Honor, is on the workers'

18  compensation component, where in a gross amount, I think the

19  parties are in a ten-million-dollar claim range, Your Honor.

20           THE COURT:  But we agree we're okay on the contested

21  matter.

22           MR. OSWALD:  Well, that was the purpose of sitting

23  there and negotiating and agreement.  And again, the process

24  that we agreed to was we would provide -- they would provide us

25  with a clear and concise statement of the claim with the

1    backup.  We would provide them with a position statement, *vis-*
2    *a-vis* this particular piece of the claim, this 1995 to '99, A,
3    why we thought it was not the subject of the QIL collateral; B,
4    why the Court retained the jurisdiction.
5            THE COURT:  Okay.
6            MR. OSWALD:  It harkens back to the stipulation,
7    specifically reserving, if you will.
8            We conceded last time, Your Honor may recall, we don't
9    come here to say all disputes with the insurance company are
10   properly before this Court.  Mr. Davis properly indicated --
11           THE COURT:  Okay.  We'll get a chance to argue.
12           MR. OSWALD:  Yeah.
13           THE COURT:  I'm asking one specific question.
14           MR. DAVIS:  I --
15           MR. OSWALD:  But we believe the Court -- we believe
16   that's what --
17           THE COURT:  We're on a contested matter.
18           MR. OSWALD:  -- the parties agreed to.  And the
19   parties --
20           THE COURT:  You brought it.  I don't know how you can
21   argue against it.
22           MR. DAVIS:  Your Honor, we were -- we were ordered to
23   bring it, and we're not going to argue against it.  But if it's
24   incorrect, it is -- it stands where it stands.
25           THE COURT:  Okay.  That's all I need to know.

1          Do you two parties agree on the amount of Saint

2    Vincents Hospital's losses?

3          MR. DAVIS:  I don't know that we've ever discussed it.

4    They specifically sent us --

5          MR. OSWALD:  Yeah, I don't think we've gotten down to

6    the penny, but I think that -- we think this piece of the

7    losses is about $2 million.

8          MR. DAVIS:  So do we.

9          MR. OSWALD:  And I think they think they're in that

10   range, too.  I can't -- I don't think we've come to the

11   specific dollar amount, but certainly --

12         THE COURT:  It's there.

13         MR. OSWALD:  -- from what we're hearing from both

14   clients, the dollar amount is not really going to --

15         MR. DAVIS:  We stated the dollar amount --

16         MR. OSWALD:  -- hold us up on the issue.

17         MR. DAVIS:  -- in the statement that the court ordered

18   us to provide on August 8th, and there's been no push-back to

19   that number.

20         THE COURT:  Does AIG have an ability to draw down on

21   the letters of credit unilaterally?

22         MR. DAVIS:  We think we do, actually, because it's not

23   property of the estate, it's not governed by the automatic

24   stay.  But we choose not to because we don't want to act

25   unnecessarily in a contested -- in a controversial way.  We're

1   hoping to keep --

2           THE COURT:  Yeah, you heard the ruling before.

3           MR. DAVIS:  Yeah.

4           THE COURT:  Okay.  Is cash actually transferred to an

5   escrow account?

6           MR. DAVIS:  Which cash?  The letter of credit hasn't

7   been drawn.

8           THE COURT:  At all.

9           MR. DAVIS:  At all.

10          MR. OSWALD:  That's correct.

11          MR. DAVIS:  And by the way, the debtors' name does not

12   appear on the letter of credit at all.  It's not issued at the

13   request of a letter of the debtor, it isn't issued with the

14   debtor as a beneficiary, it isn't issued with the debtor as an

15   account party, it --

16          THE COURT:  So the reserve is basically a book entry;

17   is that what I've got?

18          MR. DAVIS:  Reserves are a book entry, but they can --

19   you can also have a cash reserve.  In this case, I'm not sure

20   how to answer your question, Your Honor.  I just don't

21   understand the question.

22          MR. OSWALD:  Well, from our side of the table, Your

23   Honor, I think they first have to establish a valid claim

24   before you can seek the remedies.  Remember, this is collateral

25   for Saint Vincents' claim.  My understanding is that other

1    losses, other parts of the claims over the years have been paid

2    by Saint Vincents --

3              THE COURT:  Okay.  You're going to have to --

4              MR. OSWALD:  -- the primary obligor.

5              THE COURT:  When you say something to me, you're going

6    to have to -- when you say something to me, you're going to

7    have to define "Saint Vincents Hospital," "Saint Vincents

8    Medical Center."

9              MR. OSWALD:  All right.  Judge --

10             THE COURT:  Too many Saint Vincents --

11             MR. OSWALD:  Yes.

12             THE COURT:  -- running around here.

13             MR. OSWALD:  Saint Vincents Medical Center, the

14   debtors --

15             THE COURT:  The merged entity --

16             MR. OSWALD:  Right.

17             THE COURT:  -- in 2000 --

18             MR. OSWALD:  Yes.

19             THE COURT:  -- that went through bankruptcy and were

20   now the debtors.

21             MR. OSWALD:  Yes.

22             THE COURT:  Okay.

23             MR. OSWALD:  Apologize, Your Honor.

24             THE COURT:  Just be clear --

25             MR. OSWALD:  And --

1          THE COURT:  -- with me.

2          MR. OSWALD:  I will.  And against whom these proofs of

3    claims were filed.

4          MR. DAVIS:  Your Honor --

5          MR. OSWALD:  But we agree that there's been no draw on

6    the letter of credit.

7          MR. DAVIS:  We --

8          MR. OSWALD:  And I -- and we agree that the debtor

9    Saint Vincents Medical Center is not a party to that letter of

10   credit.

11         THE COURT:  Okay.  There's my question.

12         MR. OSWALD:  Okay.

13         MR. DAVIS:  Yeah, we -- Your Honor, we have claims

14   both against QIL and against the debtors.  And we haven't --

15         THE COURT:  Don't get ahead of --

16         MR. DAVIS:  -- drawn the letter of credit for either.

17         THE COURT:  -- my questions, either one.

18         MR. DAVIS:  Okay.

19         THE COURT:  I have --

20         MR. DAVIS:  I'll try not to.

21         THE COURT:  I'm linear, so you got to help me here.

22         MR. DAVIS:  I'll do the best I can.

23         THE COURT:  Does everyone agree that the AIG claims

24   are not secured by any property of the debtors with respect to

25   Code Section 541?  Do you want me to read it to you?

1         MR. DAVIS:  No, I know the -- I don't know of any.  I

2    mean, Your Honor, the -- it's -- it's conceivable the debtor

3    might -- we might owe money to the debtor for some purpose, for

4    which we would have an offset, but I don't know of any, and

5    none is asserted at this time.

6         The security we're claiming, the security at issue

7    here today, is the letter of credit and the $800,000 that QIL

8    provided.

9         THE COURT:  Debtor?

10        MR. OSWALD:  Correct.

11        THE COURT:  Okay.  Does anyone agree [sic] that the

12   QIL letters of credit are not property of the estate?

13        MR. DAVIS:  I'm sorry.  That was a double-negative.

14   I'm sorry.  Would you read it again?

15        THE COURT:  I don't think it was a double-negative.

16        MR. DAVIS:  I -- I got confused.  My mistake -- my

17   bad.  Could you just tell me --

18        THE COURT:  Yeah.  Does everyone agree that the QIL

19   letters of credit are not property of the estate?

20        MR. DAVIS:  Yes.

21        THE COURT:  There's no double-negative in there.

22        MR. DAVIS:  You're absolutely right, there's no

23   double-negative.  And I agree with that statement.

24        MR. OSWALD:  That's correct.  The letter of credit is

25   QIL's.  And again, we -- our interest is the interest in the

```
 1   excess --

 2           THE COURT:  So -- so you --

 3           MR. OSWALD:  -- letter of credit, the collateral.

 4           THE COURT:  -- have nothing to rebut that.  Okay.

 5           Does Section 506(a) control whether there is an

 6   allowed secured or allowed unsecured claim in the Bankruptcy

 7   Court?

 8           MR. OSWALD:  We believe it does, Your Honor.

 9           THE COURT:  AIG?

10           MR. DAVIS:  You mean in general or -- or as in this

11   case?

12           THE COURT:  Does 506 control whether there is an

13   allowed secured or unsecured claim in the bankruptcy case, in

14   this case?  We're only talking --

15           MR. DAVIS:  Against property of the estate?

16           THE COURT:  -- about this case.

17           MR. DAVIS:  Yes.

18           THE COURT:  I'm not here for a philosophical

19   discussion.

20           MR. DAVIS:  Thank you.  Yeah, we would agree that 506

21   would -- would govern whether there's a secured claim against

22   property of the estate.

23           THE COURT:  So both of you, does that mean -- doesn't

24   that mean that all claims are unsecured for the purpose of the

25   bankruptcy case, and that AIG has a contractual right outside
```

1    of bankruptcy to enforce their rights against collateral

2    wherever that collateral might lie?

3            MR. DAVIS:  Yes, Your Honor, we think so.

4        (Participants confer.)

5            MR. OSWALD:  Provided that --

6            THE COURT:  You can let the associate --

7            MR. OSWALD:  Well --

8            THE COURT:  -- argue, if you want to.

9        (Laughter.)

10           MR. OSWALD:  Provided -- but provided the claims are -

11   - as my colleague reminds me, provided that the claims are

12   arising under that payment agreement, the 1998 payment

13   agreement.

14           THE COURT:  Answer that question.  You mean all claims

15   for unsecured purposes of the bankruptcy case.  Doesn't that

16   mean that all claims are unsecured for the purposes of the

17   bankruptcy claims, with AIG having contractual rights outside

18   of bankruptcy to enforce their rights against collateral,

19   wherever that collateral may lie?

20       (Participants confer.)

21           MR. OSWALD:  Ms. Sheikh can respond.  She knows the --

22           THE COURT:  Thank you.

23           MR. OSWALD:  She knows the payment agreement --

24           THE COURT:  State your name for the record.

25           MR. OSWALD:  -- better than I do.

1          MS. SHEIKH:  Lara Sheikh of Togut, Segal & Segal for

2     the liquidating trust.

3          Your Honor, AIG is enforcing its rights under a cross-

4     collateralization agreement that provides that obligations

5     between CMC and AIG and the agreements between --

6          THE COURT:  For the record, say "Catholic Medical

7     Centers."  I do not like acronyms.

8          MS. SHEIKH:  Oh, I apologize.  There's a -- there is a

9     cross-collateralization agreement that was entered into in

10    1998, concurrently with the 1998 payment agreement, between AIG

11    and Catholic Medical Centers, the predecessor to Saint Vincents

12    --

13         THE COURT:  Saint Vincents Medical Center.

14         MS. SHEIKH:  -- Catholic Medical Center --

15         THE COURT:  Okay.  Catholic Medical Center.

16         MS. SHEIKH:  -- of New York.

17         THE COURT:  Okay.  It's not a question of whether they

18    can assert the right.  The issue is whether 506(a) applies; and

19    thus, whether the claims are secured or unsecured in

20    bankruptcy.  That's the question.

21         MS. SHEIKH:  I agree, Your Honor.  And I had

22    understood that there was a separate question as to whether AIG

23    could --

24         THE COURT:  Can enforce those.  That is.

25         MS. SHEIKH:  Enforce --

1    THE COURT:  But answer the first one --

2    MS. SHEIKH:  I see.  Yes, I -- I agree that the

3    question is whether AIG's claims are secured or unsecured under

4    506 of the Bankruptcy Code.

5    THE COURT:  Okay.  And then, once -- and if they are

6    unsecured, because when -- if 506 controls, doesn't that mean

7    that all claims are unsecured for the purposes of the

8    bankruptcy case?  That's what I said, because we said yes to

9    that.  If 506 controls, does AIG have a contractual right

10   outside of bankruptcy to enforce their rights against the

11   collateral, wherever that's found?  And you said yes to the

12   first part of that, so --

13   MS. SHEIKH:  Oh, actually, let me clarify then.  I may

14   have misunderstood.

15   THE COURT:  And so you didn't answer.

16   MS. SHEIKH:  I do not believe --

17   THE COURT:  Yeah.

18   MS. SHEIKH:  Yeah.  I don't believe that all of AIG's

19   claims are unsecured.  A portion of AIG's claims are secured.

20   THE COURT:  Okay.  What controls, though?  You're

21   saying no.  So what controls that?  Secured by what?

22   MS. SHEIKH:  They are secured by collateral that was

23   provided by a non-debtor, QIL, under the agreements that were

24   entered into with the debtors' predecessor.

25   THE COURT:  We're only talking about property of the

1    estate.  Is it secured by property of the estate?

2              MS. SHEIKH:  The collateral is not property of the

3    estate, that is correct.

4              THE COURT:  So it's not secured by property of the

5    estate.

6         (Participants confer.)

7              MS. SHEIKH:  That's correct.

8              THE COURT:  Okay.  Then my question, debtors:  Upon

9    what basis can this Court exercise jurisdiction over this non-

10   debtor entity?

11             MR. OSWALD:  We believe the nexus is the debtors'

12   interest in that letter of credit.  In other words, as I said

13   earlier, to the extent that --

14             THE COURT:  Does it matter that the QIL letter of

15   credit is not property of the estate?

16             MR. OSWALD:  I don't think it --

17             THE COURT:  Aren't you just a holder of that?  It's

18   still a claim.

19             MR. OSWALD:  Well, we -- we believe there's enough of

20   a nexus there between the Saint Vincents Catholic Medical

21   Center debtor and its interest in that letter of credit and the

22   collateral that backs up that letter of credit to give this

23   Court jurisdiction.

24             MR. DAVIS:  We, of course, disagree.  And I would

25   characterize the situation somewhat differently.  The debtor

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 29 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 93 of 132

93

1   does not actually have an interest in the residual dollars that

2   might be available from non -- not depleting the letter of

3   credit.  The debtor owns the shares of QIL.  And those dollars

4   might end up being the source of a dividend.  But what the

5   debtor owns are the shares of QIL.  And the Second Circuit has

6   been clear, time and again, that owning shares does not give

7   you jurisdiction over the property of the entity in which you

8   own shares.

9            THE COURT:  Do you wish to add anything?  I need you

10  to respond to what -- I'm sorry ...

11           MR. OSWALD:  Yeah, again, we think, based upon the

12  support -- the arguments we made in the papers --

13           THE COURT:  -- what Mr. Davis said.  I wanted to call

14  him "David."  What Mr. Davis said.

15           MR. DAVIS:  People have called me that from time to

16  time.  I don't mind.

17           THE COURT:  I'm sorry, I didn't hear --

18           MR. OSWALD:  No, I didn't have anything to add other

19  than my earlier argument, Your Honor, what we said in the

20  papers.

21           THE COURT:  You don't have any response to what Mr.

22  Davis just said?

23           MR. OSWALD:  No.  We believe that you have -- the

24  requisite nexus is there, and this Court has -- can determine

25  whether or not this piece of the claim, the two-million-dollar

1    piece or thereabouts, is secured or not.

2            THE COURT:  And it doesn't matter that QIL is not a

3    debtor --

4            MR. OSWALD:  Right.

5            THE COURT:  -- cannot be a debtor.  All right.

6            For both of you, I have this question.  Filing a proof

7    of claim raises core jurisdiction under the allowance or

8    disallowance of a claim.  Are we core or are we non-core?  What

9    have we got here?

10           MR. DAVIS:  The issue of the allowance of our claim

11   against the property of the estate is a core proceeding;

12   however, the Hagerstown case, among others, holds that, even as

13   a core proceeding, disputes about that claim would be subject

14   to arbitration.  But that's not the issue today.  The issue --

15           THE COURT:  That's right --

16           MR. DAVIS:  Yeah.

17           THE COURT:  -- it's not, so ...

18           MR. DAVIS:  Yeah.  The issue today is:  Are we core

19   with respect to the claim against QIL?  No.  We're not only not

20   core, we're not even within the Court's jurisdiction at all.

21           MR. OSWALD:  Well, again, we believe we are

22   substantial core under the Hostess line of cases.  We think

23   Hagerstown was on point, as well.  You do have these nine

24   claims.  The component of --

25           THE COURT:  I -- and before you go -- Mr. Davis, why?

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 31 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 95 of 132

95

1   Tell me why.

2          MR. DAVIS:  Why which?  I'm sorry.

3          THE COURT:  Well, by your statement, I want to know

4   why.  Repeat your statement to me.  I can't -- I --

5          MR. DAVIS:  Oh, why --

6          THE COURT:  Why was coming up, and my brain went off

7   because Mr. Oswald spoke.

8          MR. DAVIS:  I'm sorry.  I'm not sure what statement

9   you're referring me back to.  But if it was --

10          THE COURT:  If I'm determining a claim --

11          MR. DAVIS:  Yes.

12          THE COURT:  -- and you think -- don't think that's --

13   that's the --

14          MR. DAVIS:  You can determine the amount of the claim.

15          THE COURT:  Right.

16          MR. DAVIS:  Unless there's an arbitration clause,

17   which the enforcement of which does not conflict with the

18   Bankruptcy Code.

19          In the Hagerstown case, the Thorpe case in the Ninth

20   Circuit, the U.S. Lines case in this circuit, the series of

21   cases, which as the Thorpe Court said the sister circuits have

22   all agreed upon.  The established rule -- and we -- I think

23   pretty much universally now is that bankruptcy courts do not

24   have discretion to refuse arbitration unless the Bankruptcy

25   Code itself implicates what the rights of the parties are, as

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 32 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 96 of 132

96

1   distinguished from the procedural matter.

2           In Hagerstown, this Court, the Southern District, said

3   you have procedurally core matters which must be allowed to

4   arbitrate, and you have substantively core matters which are

5   not.  I can go on, on this.  I'm not sure, I may be over-

6   answering your question, but --

7           THE COURT:  That's the second issue.  I'm on the first

8   issue.

9           MR. DAVIS:  Yeah.

10          THE COURT:  I'm on procedural of core and non-core,

11  and whether or not this Court is asked to allow or disallow a

12  claim right now.

13          MR. DAVIS:  Yeah.  A claim is procedurally core if the

14  substantive rights being adjudicated are derived from non-

15  bankruptcy law.  A claim is core if the substantive rights

16  being adjudicated are derived from bankruptcy law.  That's why

17  Hostess, which was adjudicating access to cash collateral --

18          THE COURT:  I --

19          MR. DAVIS:  -- which is governed by --

20          THE COURT:  I got that Hostess.

21          MR. DAVIS:  Yeah.  Yeah.

22          THE COURT:  Let me take a look.  Okay.

23          MR. DAVIS:  Like 503(c), the issue is governed by bank

24  -- by the Bankruptcy Code.

25          In Hagerstown, you had claims, some of which were

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 33 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 97 of 132

97

1   governed by the Bankruptcy Code, and some of which were not.

2          In the Continental case that they write about in their

3   brief, the issue was:  Did the debtor have -- I'm sorry -- did

4   the claimant-creditor have a claim because -- based on the fact

5   that the plan violated the contract?  And the Court said, well,

6   of course that's core because the question is does the plan

7   violate the contract.

8          So the line that's been drawn by the circuit courts

9   throughout the country, I think uniformly now, is that if the

10  underlying right is derived from non-bankruptcy law, then

11  arbitration continues to control; and if the underlying right

12  is derived from the Bankruptcy Code, then it's not.

13         THE COURT:  Mr. Oswald, can you cite -- can the debtor

14  cite that core jurisdiction extends to whether a claim is

15  secured or unsecured when the application of 506(a) is not at

16  issue?

17         MR. OSWALD:  Well, but again, Your Honor, we think --

18  yeah, they have filed their proofs of claim here.  A component

19  of the proofs of claim covers this period of 1995 to 1999.  The

20  payment agreement is relied upon by AIG in support of that

21  claim.  Saint Vincents Hospitals -- not Saint Vincents Medical

22  Center -- the pre-merged entity is not a party to that

23  agreement.

24         And again, the threshold issue before any creditor

25  seeks relief against collateral or gets paid even on an

Case 1:13-cv-06902-PKC Document 16-26 Filed 05/16/14 Page 34 of 39
10-11963-cgm Doc 3720 Filed 09/23/13 Entered 09/23/13 15:38:09 Main Document
Pg 98 of 132

98

1   unsecured claim is establishing what that claim is and the

2   character of that claim. And I think that's what this Court

3   does. I think, frankly, that's what the Eighth Circuit, that

4   Thorpe case indicated, that the proofs of claim implicate the

5   bankruptcy, and the jurisdiction and the distribution issues to

6   creditors, and that was part of that rationale.

7           THE COURT: Well, Mr. Davis, how can you -- but this

8   is a -- let me go back for a second, though, before I go to Mr.

9   Davis. This is a non-debtor, non-property-of-the-estate

10  collateral. Why is that core jurisdiction? Based just on

11  filing of the proof of claim?

12          MR. OSWALD: Again, the collateral is backing up a

13  claim of a debtor, proof of claim filed against the debtor --

14          THE COURT: Well, just a moment on that.

15          MR. OSWALD: Uh-huh.

16          THE COURT: Backing up the claim of a debtor who is

17  the equity holder of that non-debtor?

18          MR. OSWALD: The --

19          THE COURT: Your associate wants to say something;

20  she's itching.

21      (Laughter.)

22          MS. SHEIKH: Well, Your Honor, I think that it's

23  important to recognize that the resolution of the SVH losses is

24  one component of numerous claims that have been asserted by

25  AIG; that they assert are all secured by collateral, which was

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 35 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 99 of 132

99

1   provided by a non-debtor, QIL.  And we believe that they are --

2            THE COURT:  But today, we're only --

3            MS. SHEIKH:  -- over-secured --

4            THE COURT:  -- on these four claims.

5            MS. SHEIKH:  That's correct.

6            THE COURT:  Today, we're only four claims.

7            MS. SHEIKH:  That's correct.  But I -- I -- when you

8   read the Hostess decision --

9            THE COURT:  I -- okay.

10           MS. SHEIKH:  -- in particular --

11           THE COURT:  I've got it right here.

12           MS. SHEIKH:  -- I think that -- and we didn't -- we

13  didn't fully address in our cross-motion and our response to

14  the motion this issue of turnover, which will be an ultimate

15  issue, once AIG's claim against the estate is fixed, and we'll

16  --

17           THE COURT:  I guess I'm trying to get nexus more

18  clearly today.

19           MS. SHEIKH:  Right.  So the core --

20           THE COURT:  And that's my question.

21           MS. SHEIKH:  Right.  The substantially core issue

22  within -- kind of as the case law has developed in the Second

23  Circuit is the ultimate issue, which is:  What is the secured

24  claim that AIG has against the estate?  And we -- and we

25  believe that that is an issue that's within this Court's core

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 36 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 100 of 132

100

1  jurisdiction to determine, to what extent AIG has a secured

2  claim.

3        And I am not aware of any case law that -- that any of

4  the -- the case law cited by AIG for the proposition that a

5  letter of credit is not property of the estate, we don't

6  dispute that.  But I don't think those cases address what

7  portion of a claim that a party has against the -- an estate --

8  a debtor's estate is secured by a letter of credit.

9        THE COURT:  Mr. Oswald, do you want to add?

10        MR. OSWALD:  Again, just to crystalize it, you're

11  right.

12        THE COURT:  Okay.

13        MR. OSWALD:  We're dealing with, just for today, this

14  one issue on these four claims.

15        THE COURT:  Right.

16        MR. OSWALD:  Claims against the debtor, and whether or

17  not they are secured or unsecured.  Granted, the security sits

18  with the non-debtor sub.

19        THE COURT:  Right.  Right.

20        MR. OSWALD:  Okay?  You don't pay out on the claim,

21  the security comes to the debtors and its creditors.

22        THE COURT:  And that non-debtor sub, the debtors

23  basically only hold an equity interest in it.

24        MR. OSWALD:  Yes.

25        THE COURT:  Okay.

1    MR. DAVIS:  And if I may --

2         MR. OSWALD:  And then -- and then just add for the --

3    I think that, not only the Hagerstown, but the Hostess -- Your

4    Honor said you have the Hostess decision there.  But the other

5    factors that go into substantially core and whether the parties

6    did agree to arbitrate, again, that's one of the reasons that

7    that stipulation that Your Honor referred to before has the

8    exclusion is this issue, I presume it was on the radar.  And

9    you'll notice our firm wasn't a party to that stipulation;

10   Kramer handled that.  But that's why we dispute that that -- on

11   this core -- this issue was not subject to the arbitration

12   agreement.

13        THE COURT:  And Mr. Davis, how can you separate the

14   allowance of your proof of claim in the bankruptcy case from

15   the determination of whether the QIL letters of credit secure

16   the claim.

17        MR. DAVIS:  It's -- really, it's something that

18   happens all the time, when you have a guarantor, Your Honor.

19   The amount of our claim will be fixed by this Court, to the

20   extent it's a general unsecured claim.  And that issue may,

21   itself, be subject to arbitration, but that's not subject to

22   today's discussion.  I can show you there is an arbitration

23   clause.

24        Should we have a dispute about the amount of that

25   claim, and we don't seem to, we would have -- we would have a

1   right to arbitrate that dispute, also, because it's purely a

2   matter of contract, it has nothing to do with bankruptcy law

3   whether the amount of that claim is 2 million or 2.2 million,

4   or whatever the disagreement might be, if there is a

5   disagreement.

6           I would point out, by the way, we're in arbitration

7   with the debtors right now.

8           THE COURT:  We know you are.

9           MR. DAVIS:  Yeah.

10          THE COURT:  We've already said that.

11          MR. DAVIS:  Yeah, and --

12          THE COURT:  Everything -- we're only here on these

13  four.

14          MR. DAVIS:  And --

15          THE COURT:  Does it affect the value of the debtors'

16  asset if your claim is secured or unsecured?

17          MR. DAVIS:  Only -- if they own shares in any company,

18  if they owned shares in Apple Computer, and Apple Computer has

19  a litigation with somebody, it would affect the value of the

20  estate, whether Apple prevails or loses in that -- in that

21  dispute.  That doesn't give this Court jurisdiction over a

22  dispute between Apple and Samsung, just because they're a

23  shareholder in Apple.

24          THE COURT:  This is --

25          MR. DAVIS:  And that's what --

Case 1:13-cv-06902-PKC   Document 16-26   Filed 05/16/14   Page 39 of 39
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 103 of 132

103

1          THE COURT:  This is -- this is --

2          MR. DAVIS:  -- the Second Circuit --

3          THE COURT:  -- a bankruptcy case.

4          MR. DAVIS:  And that --

5          THE COURT:  We're talking about a bankruptcy case.

6          MR. DAVIS:  That's what we -- but we are talking about

7  that.  If --

8          THE COURT:  Apple is not in bankruptcy.

9          MR. DAVIS:  No.  Your Honor, please.  If Saint Vincent

10 owned shares in Apple, and Apple has a multi-billion-dollar

11 dispute with Samsung -- and they do, if I got that correct in

12 my head -- that multi-billion-dollar dispute could affect the

13 value of their holdings in Apple.  But that doesn't give this

14 Court any jurisdiction over the dispute between Apple and

15 Samsung because all they are, are a shareholder.

16         The Second Circuit has said time and again --

17         THE COURT:  What case?  Give me a case when you say

18 that.

19         MR. DAVIS:  The case -- it's the Beck v. Feldman case

20 that we cited in our brief, and then I would cite you to --

21         THE COURT:  Does it make a difference that QIL is

22 wholly owned?

23         MR. DAVIS:  No, not at all.  And that's what the

24 Second Circuit said.

25         THE COURT:  And Apple is publicly traded; QIL is not.