1       MR. DAVIS: Yeah, it makes no difference. The cases

2   the Second Circuit ruled upon were wholly owned -- the Beck v.

3   Feldman case was wholly owned. The -- I'm just looking through

4   my papers here for the other case I wanted to talk about.

5   Tower Automotive, which is from this Court. The -- where's the

6   name of the Court? Southern District of New York, Tower

7   Automotive, also in our brief, wholly owned. Both wholly

8   owned. Both cases, the Court said --

9       THE COURT: Was that Judge Gropper? Who was that?

10      MR. DAVIS: One moment. Yes, Judge Gropper.

11      THE COURT: Okay.

12      MR. DAVIS: Both courts -- both the Beck v. Feldman

13  Court and the Tower Court said that, as long as the subsidiary

14  is not a sham -- and that's the standard -- then jurisdiction

15  of this Court does not reach a dispute that the subsidiary may

16  have.

17      THE COURT: Okay. And you just said that y'all --

18  okay. Go ahead. Yes.

19      MR. OSWALD: Your Honor, using your example, this is

20  not a shareholder interest in an entity that's going to be

21  adversely or otherwise impacted by that entity's business

22  dealings, so the Apple/Samsung disputes. These are claims

23  emanating out of the insurance company underwriting the

24  hospitals' claims.

25      The obligation of QIL, the collateral -- the entity to

1    put up the collateral, they're all intertwined.  This has --

2    QIL -- it's not QIL's operations impacting a shareholder.  It's

3    the -- what are the claims, ultimately, of AIG, what are the

4    allowed, valid claims of AIG against these debtors.  And once

5    that is determined, whether by agreement or by the Court or by

6    arbitration, what portion of that may AIG get paid from the

7    collateral?  As opposed to getting paid in bankruptcy dollars

8    under the Chapter 11 plan.

9         THE COURT:  Do you have any case that distinguishes

10   that scenario that was just put out there on Apple/Samsung?

11        MR. OSWALD:  I don't, off the top of my head, but I

12   was running with your example, Your Honor.

13        THE COURT:  I -- well, his example.

14        MR. OSWALD:  Oh, okay.

15        THE COURT:  I just grabbed it.  Okay.  And you --

16        MR. OSWALD:  My sole point is the direct nexus of the

17   proofs of claim --

18        THE COURT:  But what I'm hearing --

19        MR. OSWALD:  -- filed in this -- in the --

20        THE COURT:  -- from you is that this is augmenting the

21   estate if -- if it stays here, possibly.

22        MR. OSWALD:  Sure.  The debtors believe it ultimately

23   will.  I appreciate that, now that we've gotten a statement of

24   the claim, pursuant to Your Honor's -- the so-ordered

25   stipulation; that, pursuant to that statement, they assert the

1  claim now exceeds the collateral.  But ultimately, when the

2  claims are determined, we certainly believe the estate will be

3  augmented, and that collateral will be released.

4       MR. DAVIS:  If I may, Your Honor.

5       MR. OSWALD:  But that's not for today.

6       THE COURT:  I know that's not for today.  I'm

7  thinking.

8       MR. OSWALD:  We don't -- we don't know what the claim

9  is.

10      MR. DAVIS:  I would --

11      MR. OSWALD:  On this little piece --

12      THE COURT:  Mr. Davis, let me ask you a question.  You

13  mentioned a moment ago that you are in some arbitration.

14      MR. DAVIS:  Yes.

15      THE COURT:  So if this Court agrees with you and

16  decides that the Court lacks jurisdiction over the QIL claims,

17  so where do you go to resolve that dispute?

18      MR. DAVIS:  Well, like any matter in commerce, the

19  parties first would discuss it; and, if we don't agree, either

20  party can commence an arbitration proceeding to resolve it.  We

21  already have an arbitration proceeding, and it's our view that

22  the practical approach at this point would be to assert this

23  dispute, if it turns out to be a dispute, as a counterclaim in

24  the existing arbitration, so as to not delay getting started

25  and getting going.  And that's what we contemplate doing, but

Case 1:13-cv-06902-PKC   Document 16-27   Filed 05/16/14   Page 4 of 29

```
 1   . . .

 2            THE COURT:  In that -- go ahead.  In that merger

 3   agreement --

 4            MR. OSWALD:  I --

 5            THE COURT:  Go ahead, you want to mention --

 6            MR. OSWALD:  I was just going to comment again on the

 7   arbitration, so we're clear.  The arbitration relates to the

 8   handling of claims that have already been --

 9            THE COURT:  Okay.

10            MR. OSWALD:  -- dealt with and issues that the debtors

11   have with the handling of those claims, so nobody has taken the

12   issue of these proofs of claim to arbitration.

13            And I took the liberty, Your Honor, if there were any

14   -- on the arbitration, I have counsel for the debtors handling

15   the arbitration is here with us in court.  But I understand

16   that hasn't really progressed that much since last we were

17   here.

18            THE COURT:  Okay.  And I have -- I still have some

19   more questions.  I'm trying to understand all this.

20            I think, in the papers, that Saint Vincents Hospital

21   and the Saint Vincents losses were -- are covered under the --

22   you disagree that they are covered under the payment agreement.

23   And is the merger silent with respect to all obligations of

24   Saint Vincents Hospital that were assumed by Saint Vincents

25   Catholic Medical Center?
```

10-11963-cgm 13-Doc 9728-PKC Document 16-27 Filed 09/23/13 Filed 05/16/14 Entered 09/23/13 15:38:03 Page 5 of 29 Main Document
Pg 108 of 132

108

```
 1          MR. DAVIS:  Well, a merger can't be silent because
 2    it's a matter of state law when you merge two corporations.
 3    All the obligations of each become obligations of the other.
 4    And all contracts of one become contracts of the other.
 5          THE COURT:  We -- okay.  I think we need to see that
 6    merger agreement.  But you're -- you cite New York Business
 7    Corporation Section 906(b)(3) for the proposition that the
 8    surviving or consolidated corporation shall assume and be
 9    liable for all the liabilities and obligations, penalties for
10    the other.  And you say this applies?
11          MR. DAVIS:  Oh, yes.
12          THE COURT:  Debtors?
13          MR. OSWALD:  Well, I -- we're a not-for-profit, so I
14    don't think the for-profit provision provides [sic].  But
15    again, just to be clear, I don't disagree with the general
16    proposition that, on a merger, liabilities -- the assets and
17    the liabilities go together.  That doesn't necessarily mean
18    that the collateral goes with it.  And that, again, comes back
19    to the issue of whether or not, for these four policies, they
20    can look to the collateral.
21          MR. DAVIS:  And as to that, there is --
22          MR. OSWALD:  Because they're not -- because they're
23    not a party to that payment agreement or the -- or the cross-
24    collateralization agreement.
25          MR. DAVIS:  I could address that, if you want to hear
```

109

1    why that's an inaccurate statement.

2              THE COURT:  Okay.

3              MR. DAVIS:  The payment agreement that -- there are

4    two payment agreements, in fact, that are attached to our

5    papers.  There's the 1998 payment agreement with Catholic

6    Medical Center, pre-merger, which has been subject to a series

7    of annual schedules, which become part of the agreement.  And

8    the most recently signed annual schedule, the one that was

9    signed effective 2009 -- and I can put this on the ELMO, if it

10   would help, Your Honor.

11             THE COURT:  Please, please.  That makes it easier for

12   me.

13             MR. DAVIS:  Uh-huh.

14      (Participants confer.)

15             THE COURT:  No, he's putting it on the ELMO, so we all

16   see it at the same time and we all look at it together.

17             MR. DAVIS:  This is a schedule --

18             THE COURT:  It should be on your monitor.

19             MR. DAVIS:  It's in my papers as Exhibit V.  It was

20   executed in July -- September of 2009.  And it provides that

21   the $38 million of collateral provided by QIL at that time

22   would be available under the payment agreement.

23      (Participants confer.)

24             THE COURT:  No, we can make it better.

25      (Participants confer.)

10-11963-cgm-13 Doc 9726 PKC Document 16-27 Filed 05/16/14 Page 7 of 29
Case 1:13-cv-06902-PKC Document 16-27 Filed 05/23/13 Entered 05/23/13 16:38:09 Main Document
Pg 110 of 132

110

1          THE COURT:  Is it coming up?  Y'all see it?

2          UNIDENTIFIED:  Uh-huh.

3       (Participants confer.)

4          THE COURT:  Okay.  There, we can read it clearly.

5   That's good.

6          MR. DAVIS:  Getting back to the -- just it's signed in

7   2009, where you see where I'm pointing.

8          UNIDENTIFIED:  Uh-huh.

9          MR. DAVIS:  And then it provides for the $38 million

10  of QIL collateral to be available for whatever this covers.

11  And it is between Saint Vincents Catholic Medical Center, which

12  is the merged entity, on behalf of itself, and "all your

13  subsidiaries or affiliates," which would include QIL, I

14  believe, "except those listed below," and there are none listed

15  below.  So here, you have a parent agreeing and buying all of -

16  - all of its entities, including QIL.  And this is the 2009

17  agreement.

18          It picks up, attaches to, and becomes part of this

19  1998 payment agreement.  The 1998 payment agreement says who

20  has agreed to this agreement, and it's the entities named as

21  "client" in the schedule.  And we just looked at that, and

22  that's everybody.  And then it defines "schedule" on Page 4,

23  and it says:

24          "Additional schedules or amendments may be attached to

25              this agreement from time to time."

1          Which is the most recent schedules, what I just showed

2     Your Honor.

3          And then, if you turn to "default."

4          "Failure by you" --

5          Which is any member of their family of companies.

6          "-- or any of your subsidiaries or affiliates to

7          perform within five days after due date any

8          obligation, you or any of your subsidiaries or

9          affiliates have under this agreement or any other

10         agreement with us."

11         Now at the time the schedule was signed, when the

12    schedule was signed, the "you" included Saint Vincents

13    Hospital.  So this language picks up Saint Vincents Hospital --

14         THE COURT:  And that was after the first bankruptcy,

15    which was 2005.

16         MR. DAVIS:  Yes.

17         THE COURT:  This was 2009?

18         MR. DAVIS:  This -- this was -- this was signed -- the

19    schedule which adopts this was signed in 2009.

20         Moving to the next page:

21         "In the event of default, we may satisfy your

22         obligations in whole or in part by the collateral" --

23         And then it says, highlighted in yellow:

24         "-- in order to satisfy any" -- and I emphasize the

25         word "any" -- "of your obligations."

1        Saint Vincents Hospital's obligations are obligations

2   that fall within the two words -- three words "any of your" --

3   four words -- "any of your obligations."  That's the

4   contractual basis for our right to reach the collateral.

5        Similarly, this is the -- I'm now showing you the

6   Saint Vincents Hospital payment agreement, which was entered

7   into -- this is attached to our reply papers.  It isn't

8   attached to our moving papers.  And the Saint Vincents Hospital

9   and Medical Center is the party to this agreement.  And in this

10  agreement, it provides that:

11         "We can draw upon, liquidate, or take ownership of

12          collateral deposited with us to secure your payments

13          under this agreement, and using such collateral to

14          satisfy or recoup any and all obligations to us."

15         I'm sorry.  I may have misread that.

16    (Participants confer.)

17         MR. DAVIS:  Oh, yeah, let me read that again, because

18  I misread it.

19         THE COURT:  Okay.

20         MR. DAVIS:  We're permitted to:

21         "-- draw upon, liquidate" -- "liquidating or take

22          ownership of collateral deposited with us to secure

23          your" --

24         THE COURT:  Read it correctly.  You didn't read it

25  correctly.

```
1            MR. DAVIS:  Thank you.  Draw -- we're permitting --
2            THE COURT:  "Drawing upon."
3            MR. DAVIS:  We're -- yes, I -- again, I understand.
4            "-- drawing upon, liquidating, or taking ownership of
5            collateral deposited with us to secure your payments"
6            --
7            THE COURT:  Did you just say that S -- Saint Vincents
8    Hospital is an affiliate of Catholic Medical Center?  Did I
9    just hear you say that?
10           MR. DAVIS:  What they are is they are the same entity
11   now, by merger.  They are the same entity.  They are not
12   affiliates; they are the same.  They merged.  They --
13           THE COURT:  What about pre-merger?
14           MR. DAVIS:  Pre-merger, they were -- I don't know if
15   they had any affiliation at all pre-merger.  I don't know.  But
16   today, they are the same entity.
17           THE COURT:  Okay.  That's enough.  Okay.
18           MR. DAVIS:  I'm just -- if I may finish where I wanted
19   to go with this, was, under this -- in the second line:
20           "-- under this or any other agreement" -- "involving
21           collateral under this or any other agreement."
22           So with these three agreements, we have a very
23   substantial, albeit disputed by the other side, claim to use
24   the QIL collateral for the Saint Vincents Hospital obligation.
25   And that dispute, if not resolved by agreement, will require
```

1  that it be resolved in a proceeding.  And as I can also

2  address, the only proper proceeding is arbitration,

3  particularly since it doesn't even involve property of the

4  estate.

5        THE COURT:  Saint Vincents?

6        MS. SHEIKH:  Your Honor, Lara Sheikh for the

7  liquidating trust.

8        We're finding AIG's arguments here a little bit

9  frustrating because we did set forth in our position statement

10  that we provided to them on July 25th, as well as in our

11  response to their motion, a -- our plain reading of the payment

12  agreement and why we believe -- why the liquidating trust

13  believes that the SVH losses do not arise under that agreement.

14  And AIG did not address in their motion or their reply the

15  statements that counsel just made and their interpretation of

16  these agreements.

17        But I can explain the liquidating trust's position of

18  why the SVH losses could not arise under the payment agreement,

19  which we did set forth in our paper -- in our papers.

20        I will note that the payment -- the second payment

21  agreement that AIG referenced, which is Exhibit H to their

22  reply, is -- is not related in any way to the 1998 payment

23  agreement, for which CM -- Cabrini Medical Centers, and later

24  Saint Vincents Catholic Medical Centers of New York provided

25  collateral in the form of a letter of credit issued by a non-

1    debtor.  So that 1997 payment agreement between Saint Vincents

2    Hospital, the pre-merger entity, and AIG is not in any way

3    related to the QIL collateral.  I think that's an important

4    clarification.

5            So the references to "collateral provided" under an

6    agreement entered into --

7            THE COURT:  Would you put that on the ELMO?  I"m

8    trying to follow you --

9            MS. SHEIKH:  Sure.

10           THE COURT:  -- and I'm looking at what you gave, but

11   just put it on the ELMO for me.

12           MS. SHEIKH:  Yeah.

13           THE COURT:  You're going to have to put it facing out.

14           MS. SHEIKH:  Oh, sorry.

15           THE COURT:  There.  Just because I'm --

16           MS. SHEIKH:  Or this way.

17           THE COURT:  There you go.  Thank you.

18           MS. SHEIKH:  Okay.  So this is an agreement between

19   Saint Vincents Hospital, which has been merged into the debtor

20   entity Saint Vincents Catholic Medical Centers of New York.  So

21   it's an agreement entered into --

22           THE COURT:  But this is an agreement between Saint

23   Vincents Hospital and Medical Centers of New York.  So that's

24   in -- CMC?

25           MS. SHEIKH:  That's --

```
 1              THE COURT:  Saint Vincents Hospital?

 2              MS. SHEIKH:  We refer to them as "SVH" in our papers.

 3   This is the entity that entered into the policies that Your

 4   Honor was referencing earlier that give rise to what we've

 5   defined as the "SVH losses."  So this is the -- a payment

 6   agreement between Saint Vincents Hospital, which the full name

 7   of that entity is Saint Vincents Hospital and Medical Center of

 8   New York, and AIG.  And it's -- it has no relation to the 1998

 9   payment agreement between Catholic Medical Centers of New York

10   and AIG.

11              THE COURT:  So AIG is saying the 1998 payment

12   controls, and you're saying this controls?

13              MS. SHEIKH:  Yes.

14              THE COURT:  Did I miss something?

15              MS. SHEIKH:  And it's -- I'm not -- I'm actually not

16   certain that this is the complete agreement or the current --

17   the last agreement between Saint Vincents Hospital and AG --

18   and AIG.

19              THE COURT:  On those four matters.  We're only

20   thinking about four matters here, those four contracts.

21              MR. DAVIS:  Four policy years.

22              MS. SHEIKH:  That's correct.

23              MR. DAVIS:  Four policy years might be the way --

24              THE COURT:  Four policy years.  Okay.

25              MS. SHEIKH:  Yeah.  If AIG's counsel is representing
```

Case 1:13-cv-06902-PKC   Document 16-27   Filed 05/16/14   Page 14 of 29
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 117 of 132

117

1   that those policy years -- let me rephrase that.

2           THE COURT:   Okay.

3           MS. SHEIKH:   My understanding is that AIG has attached

4   this payment agreement which is the payment agreement that

5   applies to those four policies between Saint Vincents Hospital

6   and AIG.

7           THE COURT:   Okay.  And my question to you -- are you

8   finished with that statement?

9           MS. SHEIKH:   Yes.

10          THE COURT:   Okay.  Why doesn't it apply today to cover

11  the Saint Vincents Hospital losses for those years, the 1998

12  agreement?

13          MS. SHEIKH:   I -- I don't think it's relevant to the

14  issue before the Court today because this payment agreement --

15          THE COURT:   Oh, I'm sorry.

16          MS. SHEIKH:   -- is not secured by the --

17          THE COURT:   I asked the question --

18          MS. SHEIKH:   -- QIL collateral.

19          THE COURT:   I think I asked the question wrong.  Let

20  me look at my chart.  I have my chart, too.

21          Before 2000, it was only Catholic Medical Centers that

22  had the agreement with QIL, not Saint Vincents Hospital.

23          MR. DAVIS:   Yes, Your Honor.

24          MS. SHEIKH:   That's correct.  And there -- Saint

25  Vincents Hospital had its own agreement with AIG, which I

1    understand is Exhibit H to AIG's motion.  And that agreement

2    provides that Saint Vincents Hospital will provide collateral

3    to AIG to secure the obligations on -- that Saint Vincents

4    Hospital has to AIG.  But that collateral is not the QIL

5    collateral.  And AIG has not, I don't believe, addressed in its

6    papers, you know, what collateral was provided by Saint

7    Vincents Hospital to secure those obligations.  We are -- I'm

8    not aware of what collateral was provided to secure those

9    obligations.  But as we set forth in our papers, clearly the

10    QIL collateral could not have secured those obligations

11    because, at that time, Saint Vincents Hospital and Catholic

12    Medical Centers of --

13        THE COURT:  So is there a separate pool, collateral

14    pool, for the Saint Vincents Hospital losses?

15        MR. DAVIS:  There was.  It's been exhausted.  Your

16    Honor, I'd like to respond to some of those points.

17        THE COURT:  Stop right there.  I want to go back to

18    that.

19        MR. DAVIS:  Uh-huh.

20        THE COURT:  Explain that a little more clearly to me,

21    right there.

22        MR. DAVIS:  We were provided with cash collateral for

23    the Saint Vincents Hospital losses during the 1990s.  That

24    money has been exhausted.  The losses have continued, and the

25    obligations have now come to $2 million more than the

Case 1:13-cv-06902-PKC   Document 16-27   Filed 05/16/14   Page 16 of 29
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 119 of 132

119

1    collateral previously provided.

2          During the -- during the 2000s, during the Twenty-
3    First Century, we had -- we were dealing with the Saint
4    Vincents Hospital as a collective entity because they merged.
5    And when we signed the schedules -- and there were annual
6    schedules, year after year after year, entered into after the
7    merger.  And in each one of those -- they resemble the one I
8    put up on the screen -- and the one I put up on the screen
9    showed that the $38 million of QIL collateral was provided in
10   accordance with the 1998 payment agreement.

11         The 1998 payment agreement says that the collateral
12   may be used for, quote, "any of your obligations."  And the
13   word "obligations" is lowercase, undefined, and the word "any"
14   is lowercase and undefined.  In plain English, the 1998
15   agreement, as augmented by the 2009 schedule, provided that the
16   QIL letter of credit is available for "any of your
17   obligations."  And Saint Vincents Hospital and Saint -- and
18   Catholic Medical Center, having merged, become one entity.  And
19   the word "your" applies to them equally, because they are one
20   entity.

21         And when they signed off on that language in 2009,
22   they clearly were one entity.  They also signed off on that
23   language in 2008.  They signed off on that language in 2007,
24   and you get the point.  Every year.

25         THE COURT:  Okay.  Give me your last name again.

120

```
 1          MS. SHEIKH:  Sheikh.

 2          THE COURT:  Ms. Sheikh, but in your response, you

 3   focused on the "you" in the payment, and you said the "you" was

 4   defined.  Mr. Davis said that the affiliates were not defined,

 5   but you say it was defined, as Catholic Medical Center, its

 6   predecessor successors.

 7          MR. DAVIS:  And Your Honor --

 8          MS. SHEIKH:  It is defined in the payment agreement.

 9   The payment defines --- the payment agreement defines "you,"

10   and we quote this language in our papers, in Paragraph 24.

11          THE COURT:  He said that was in lowercase.  But where

12   -- I know -- I see your -- I've got your quotes here.  I just

13   don't see where they come from.

14          MS. SHEIKH:  Well, I think "obligation" is in

15   lowercase, but "you" is -- and "client" are not in lowercase.

16   Those are uppercase and refer to the client on the title page,

17   which is Catholic Medical Centers ...

18              "-- its predecessors and successor organizations, and

19               each of its subsidiary, affiliated, or associated

20               organizations that are included as named insureds

21               under any of the policies, or their predecessors."

22          And "predecessors" is referring to predecessor

23   policies.

24          So it -- Saint Vincents Hospital is neither a

25   predecessor, nor a successor organization to CMC.  And the
```

1    policies of the named insureds under the payment agreement do

2    not include the S -- the Saint Vincents Hospital policies.  So

3    I --

4              THE COURT:  They -- so --

5              MS. SHEIKH:  I actually do not follow AIG's argument

6    to that --

7              THE COURT:  Mr. Davis.

8              MS. SHEIKH:  Mr. Davis' argument that -- that Saint

9    Vincents Hospital is obligated under the payment agreement.

10             THE COURT:  So you're saying that the merger by Saint

11   Vincents Catholic Medical Center did not assume the Saint

12   Vincents Hospital obligations?

13             MS. SHEIKH:  No.

14             THE COURT:  So when --

15             MS. SHEIKH:  The merger -- by the merger, Saint

16   Vincents Catholic Medical Centers of New York assumed Saint

17   Vincents Hospital's obligations.  But Saint Vincents Hospital

18   has no obligation under the payment agreement to be assumed by

19   Saint Vincents Catholic Medical Center of New York.

20             Saint Vincents Catholic Medical Center -- Saint

21   Vincents Catholic Medical Center of New York may have assumed

22   Saint Vincents Hospital's obligations under the 1997 payment

23   agreement that's attached as Exhibit H to AIG's papers.  But

24   there is no -- I don't believe that AIG -- Mr. Davis argues

25   anywhere in the papers that Saint Vincents Hospital is an --

1    has an obligation under the 1998 payment agreement.  He's only

2    arguing that, by virtue of the merger or the incorporation by

3    merger of Saint Vincents Hospital and Saint Vincents Catholic

4    Medical Center of New York, that Saint Vincents Hospital is

5    obligated under the 1998 agreement.  But I don't believe that

6    is sufficient to establish an obligation under the 1998 payment

7    agreement.

8              MR. DAVIS:  If I may?

9              THE COURT:  Sure.

10             MR. DAVIS:  The 1998 agreement refers to the parties

11   obligated are the parties named in the schedule.  The schedules

12   are defined as those schedules which are renewed from time to

13   time.  The 2009 iteration of the schedule was the combined,

14   merged entity.  And the combined, merged entity became subject

15   to the clause in the agreement that says, upon default, we may

16   apply the collateral, which is identified in the 2009 schedule

17   to be the QIL LOC, to "any of your obligations."  There's no

18   way they can contend that, in 2009, when they signed that

19   schedule, that Saint Vincents Hospital's obligations were not

20   obligations of the merged entity.  And the merged entity signed

21   the 2009 schedule.

22             THE COURT:  Okay.  Ten minutes, each one of you.  And

23   here are your two issues, and I want to hear ten minutes on

24   them:

25             AIG requests a ruling that this Court lacks

1  jurisdiction over the issues of whether the amount sought by

2  AIG are secured or unsecured by the two letters of credit

3  provided by QIL.  And AIG requests this Court to order

4  arbitration of the QIL collateral issues.  Give me ten minutes.

5  Those are the basic issues.  Let's hear it.  Mr. Davis, it's

6  your motion.

7          MR. DAVIS:  May I use the ELMO?

8          THE COURT:  Absolutely.  And I'm not ruling on the

9  cross-motions at this time, I just want to hear from you.

10  You've got ten minutes to figure out what you're going to say.

11          MR. DAVIS:  I know what I'm going to say.

12      (Participants confer.)

13          THE COURT:  No, you don't get ten minutes, Mr. Davis;

14  they get ten minutes.

15          MR. DAVIS:  Oh, they go first.

16          THE COURT:  No, you go first.  It's your motion.

17          MR. DAVIS:  Right.  I just want to clear the field.

18          THE COURT:  Okay.

19          MR. DAVIS:  I came over here because of the ELMO.

20          THE COURT:  Right.  If you'll just pull that

21  microphone a little.  Not that microphone, the microphone

22  that's on counsel table.

23          MR. DAVIS:  Uh-huh.

24          THE COURT:  If you'll just pull it a little bit closer

25  to you, I think we can all hear it.

Case 1:13-cv-06902-PKC   Document 16-27   Filed 05/16/14   Page 21 of 29
10-11963-cgm   Doc 3720   Filed 09/23/13   Entered 09/23/13 15:38:09   Main Document
Pg 124 of 132

124

 1          MR. DAVIS:  Okay.

 2          THE COURT:  And clearly state the exhibits you rely

 3  on.

 4          MR. DAVIS:  Okay.  As to jurisdiction, fundamentally,

 5  the jurisdiction issue turns on, number one, Section 109 of the

 6  Code.  No dispute, QIL is an insurance company; no dispute, it

 7  can't be a debtor; no dispute, it is not a debtor.  So for that

 8  reason alone, the Court lacks jurisdiction over the QIL letter

 9  of credit or any property of QIL.

10          And I would like to take a moment and point out that

11  109 is based on a sound public policy, an important doctrine.

12  Insurance companies are different.  Fundamentally, they're

13  different from commercial organizations because they take on

14  long-term, long-tail obligations.  And the liquidation statutes

15  and the liquidation laws and rules that govern insurance

16  companies, in the Cayman Islands or in any state of the United

17  States, are designed to recognize and deal with the fact that

18  insurance companies take on long-term obligations.  And there's

19  a whole different approach to how you liquidate an insurance

20  company and how you liquidate a commercial organization because

21  of the obligation of the insurance company to take on long-tail

22  obligations.  That is why 109 was written into the law, and I

23  think it's a very sound and important principle.  Nonetheless,

24  regardless of its reason, it is the law.

25          Second, QIL is merely a subsidiary.  And for instance,

125

```
 1   in Tower Automotive, Judge Gropper wrote:

 2           "In Feldman v. Beck, the Second Circuit held that

 3           bankruptcy jurisdiction did not extend so far as to

 4           permit a referee to restrain state court proceedings

 5           against a wholly owned subsidiary of the debtor, even

 6           though the value of the debtor's stock holdings in the

 7           subsidiary would be directly impacted by the results

 8           of the state litigation."

 9           And then it says, highlighted again:

10           "The only exception to this principle, according to

11           Beck" -- which is the Second Circuit -- "would be

12           proof" -- proof, not just an allegation -- "that the

13           subsidiary was a mere sham or conduit, rather than a

14           viable entity."

15           QIL, by the way -- and we can prove it if we had an

16   evidentiary hearing, has its own certified financial

17   statements, it has its own independent existence, it has its

18   own regulators, it complies with Cayman law.  And there's no

19   claim, and there could be no claim that QIL is a sham.  So

20   that's the second reason there's no jurisdiction.

21           The third reason there's no jurisdiction is the letter

22   of credit.  Here, I would point to this decision in the Enron

23   case, written by District Court Judge McMahon.  And in this

24   case, a creditor with a claim against one of the Enron entities

25   -- that Enron entity is referred to as "EMI" -- held a letter
```

Case 1:13-cv-06902-PKC  Document 16-27  Filed 05/16/14  Page 23 of 29
10-11963-cgm   Doc 9720-2   Filed 0Document 16-27  Pg 126 of 132

126

1    of credit.  They wanted to bring into the bankruptcy in New

2    York the question of the use of that letter of credit.  And

3    Judge McMahon writes:

4         "First, the collateral is not property of the debtor's

5         estate."

6         The letter of credit.

7         "Neither the letter of credit that were posted as

8         collateral by EMI, nor the proceeds obtained by

9         Celtics when it drew on those letters of credit are

10        property of Enron's bankruptcy estate.  The letter of

11        credit and their proceeds are property of the issuing

12        banks, not property of the debtors, on whose behalf

13        they were issued, and are not property of the estate

14        within the meaning of 11 U.S.C. 541.  The proposition

15        is too well settled to warrant extended discussion."

16        And then there's a citation, and the Court continues:

17        "Since an adversary proceeding lies only to determine

18        the extent of a party's interest in property that is

19        part of the estate" -- citing the bankruptcy rules --

20        "it would seem that this adversary proceeding must be

21        dismissed on that basis alone."

22        That's the Enron, that's the letter of credit point.

23        So to recap on jurisdiction, you don't have

24   jurisdiction over property of an insurance company, you don't

25   have jurisdiction over property of a non-debtor subsidiary, and

1    you don't have jurisdiction over a letter of credit.  Three

2    strikes, they're out.  Now turning -- and any one strike,

3    they're actually out.

4         Turning to arbitration.  The principle that has been,

5    I think, thoroughly now adopted by the circuits throughout the

6    United States, as exemplified by the Continental Thorpe case

7    cited in our brief, is that the Bankruptcy Court is obliged to

8    compel arbitration, to allow arbitration, if the dispute

9    involves state law, non-bankruptcy law, contractual rights.  On

10   the other hand, the Bankruptcy Court has discretion to deny

11   arbitration when the source of the right being adjudicated is

12   the Bankruptcy Code.

13        The Hostess case is a perfect example of that.  In the

14   Hostess case, the issue was whether to use cash collateral.

15   You could never take someone's cash collateral under state law

16   rights.  There is no state law, non-bankruptcy law right to use

17   cash collateral.  It only comes under the Bankruptcy Code.

18        And moreover, as the Court -- as the Hostess Court

19   pointed out, the Court was obligated to conduct a judicial

20   proceeding in that court to determine whether the standards for

21   use of cash collateral were met.  And there was no way the

22   Court was going to -- was willing to let that issue go to

23   arbitration.  That's a bankruptcy law issue.

24        In Continental, another case they talk about, the

25   Court, first of all, said that you must allow arbitration if it

1  involves a state, non-bankruptcy law issue. But what -- that

2  was a proof of claim in the Continental Thorpe case, in the

3  Ninth Circuit.

4      And what was the actual claim of breach of contract?

5  Continental's contract with the debtor in that case said the

6  debtor shall not assist anyone to assert claims against

7  Continental.  The debtor entered into a Chapter 11 plan under

8  524(g) for asbestos cases of the Bankruptcy Code.  An

9  elaborate, extensive plan -- I happened to have been

10 representing the AIG Companies in that case.

11     And the allegation was that the plan itself was a

12 breach of contract; that the plan -- the negotiation of and the

13 entry into the plan was a breach of that contractual provision

14 that Thorpe would not assist plaintiffs to assert asbestos

15 claims against Continental.  The Court said, if ever there was

16 an issue that this Court has to decide, it's whether a plan

17 itself is legal.  And the Court said, we're keeping this, we're

18 deciding, and the Court decided the plan was legal and

19 dismissed the claim, and the arbitration was not allowed.

20 Those are -- Hostess, Continental, that's when you don't have

21 arbitration, when it's the Bankruptcy Code that brings about

22 the issue.

23     In Hagerstown, the kind of issues that were kept and

24 not arbitrated were preference-type avoidance issues; issues

25 that arise under the Bankruptcy Code.  But if the issue is

1   what's the rights and duties of a party under a non-bankruptcy

2   contract, that's the case -- those are the cases that all the

3   circuits, I think -- and again, I just cite you the cases in

4   our brief -- say belong in arbitration, and the Court should

5   not deny arbitration.

6          And lastly, concerning arbitration, the United States

7   Supreme Court has said, in a rather oft-cited case called Moses

8   Cone, that any -- and this is cited in our brief -- any doubts

9   concerning arbitability should be resolved in favor of

10  arbitration.  And with that, I think I've addressed your two

11  questions.

12         THE COURT:  Very good.  Thank you.

13         Yes, Mr. Oswald.

14         MR. OSWALD:  Thank you, Your Honor.  I'll be brief,

15  because we do rely on our papers for the bulk of the two

16  questions.

17         Jurisdiction.  We have proofs of claim filed in this

18  case against these debtors.  One must determine the validity of

19  the proofs of claim, the amounts of the proofs of claim.  Then

20  you can figure out what the classification of the proofs of

21  claim are.

22         As I said before, we don't disagree that the letter of

23  credit is not property of the Saint Vincents debtors.  We

24  certainly have an interest in that -- proceeds and the

25  collateral that's been posted to back up these claims.  That's

1   been our interest.

2           Similar to the <u>Hagerstown</u> case with turnover, and the

3   <u>Hostess</u> case with the cash collateral, and where we started

4   with AIG two years ago, when our firm first got involved with

5   these claims, was to seek a release of that collateral for the

6   benefit of these debtors.  That's what started these wheels in

7   motion.

8           But for these four policies, for the claims that

9   emanate under the Saint Vincents pre-merger entity, we assert

10  they were not parties to that payment agreement, and we assert

11  that the jurisdiction of this Court meets the substantial core

12  test under Judge Drain's decision in <u>Hostess</u>.  We believe

13  <u>Hagerstown</u> is applicable, as well.  And frankly, as I said

14  before, I think the <u>Thorpe</u> case from the Eighth Circuit is

15  applicable, *vis-a-vis* the claims.

16          Saint Vincents does not seek and has not argued here

17  that arbitration is not favored.  We're familiar with those

18  cases.  I, myself, have taken liberty of the judges in this

19  Court, in particular, in Saint Vincents multiple mediations.

20  That's not the issue.  But as to this issue, we believe it is

21  quintessentially one that this Court can determine.

22          The arbitration that's been referenced before, as I

23  said, that's proceeding, that has nothing to do with these

24  proofs of claim before the Court.  That has to do with alleged

25  E&O claims that the -- that the debtors believe they have.

```
1           So wrapping it together as to the specific issue here
2    on this motion, which started with a position letter of the
3    debtors -- that's why we're a little bit out of order -- we
4    believe the Court can and does have jurisdiction to determine
5    that.  Once we determine what the claim is -- and again, Mr.
6    Davis and I agree.  I don't think we're too far apart on the
7    numbers.  But that will lend to dealing next with the overall
8    claims, and we can address the larger issue of the turnover.
9           THE COURT:  I always recommend y'all talk.
10          Any rebuttal, Mr. Davis?
11          MR. DAVIS:  No, Your Honor.
12          THE COURT:  Very good.  You're only $2 million apart.
13   You might as well talk in between time.  I'm reserving
14   judgment.  I am also reserving the right to ask you for a
15   clarification in writing on anything that I see.  So very good.
16          MR. OSWALD:  That's fine, Your Honor.
17          THE COURT:  Court is in recess.
18          THE COURT OFFICER:  All rise.
19          MR. OSWALD:  Thank you.
20          MR. DAVIS:  Thank you, Your Honor.
21      (Participants confer.)
22      (Proceedings concluded at 1:58 p.m.)
23                    *****
24
25
```

```
 1                        CERTIFICATION

 2         I certify that the foregoing is a correct transcript

 3  from the electronic sound recording of the proceedings  in the

 4  above-entitled matter to the best of my knowledge and ability.

 5

 6

 7

 8

 9  _____    September 23, 2013

10  Coleen Rand, AAERT Cert. No. 341

11  Certified Court Transcriptionist

12  AudioEdge Transcription, LLC

13

14

15

16

17

18

19

20

21

22

23

24

25
```